[No. H032044. Sixth Dist. Mar. 13, 2009.]

In re DONALD RAY LEWIS on Habeas Corpus. [And four other cases.*]

*In re Bragg (No. H032045 [Super. Ct. Santa Clara County, No. 108543]); In re Ngo (No. H032046 [Super. Ct. Santa Clara County, No. 127611]); In re Jameison (No. H032047 [Super. Ct. Santa Clara County, No. 71194]); In re Criscione (No. H032048 [Super. Ct. Santa Clara County, No. 71614]).

14

## COUNSEL

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Denise A. Yates, Deputy Attorneys General, for Petitioner D. Sisto as Warden, etc., in No. H032044.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca, Denise A. Yates and Scott C. Mather, Deputy Attorneys General, for Petitioner D. Sisto as Warden, etc., in No. H032045.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Denise A. Yates, Deputy Attorneys General, for Petitioner Ben Curry as Warden, etc., in No. H032046.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca, Denise A. Yates and Scott C. Mather, Deputy Attorneys General, for Petitioner Ben Curry as Warden, etc., in No. H032047.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Denise A. Yates, Deputy Attorneys General, for Petitioner James D. Hartley as Warden, etc., in No. H032048.

Heather J. MacKay, under appointment by the Court of Appeal, for Respondent Donald Ray Lewis in No. H032044.

Jacob Burland, under appointment by the Court of Appeal, for Respondent Morris L. Bragg in No. H032045.

Keith Wattley, under appointment by the Court of Appeal, for Respondent Viet Mike Ngo in No. H032046.

Michael Satris, under appointment by the Court of Appeal, for Respondent Donnell Eugene Jameison in No. H032047.

Barbara B. Fargo, under appointment by the Court of Appeal, for Respondent Arthur S. Criscione in No. H032048.

**OPINION**

**PREMO, J.**—In five separate proceedings below, the superior court issued five substantially identical orders[1] in which it found that California Code of Regulations, title 15, section 2402, subdivision (c)[2] is unconstitutionally vague "as applied" by the Board of Parole Hearings (Board) and that the Board is violating the separation of powers doctrine by arrogating to itself absolute power over parole matters. Based on these findings, the superior court directed the Board to develop a program to train its members in the

---

[1] The only differences in the five orders, all of which were issued on August 30, 2007, were in the case captions and in footnote *, in which the superior court took judicial notice of, and referenced by name, the other four proceedings.

[2] Unless otherwise indicated, all further undesignated references to "Regulations" are to title 15 of the California Code of Regulations.

application of parole suitability criteria as explained by relevant state and federal judicial opinions, to include provisions for continuing education of commissioners as new relevant case law is published. The superior court further directed that, prior to implementation, the newly developed training program be submitted, along with any associated rules and regulations, for the superior court's review and approval. Once the court-approved training program was in place, each of the petitioners would "receive a new hearing before a Board that does not operate with the unfettered discretion and caprice demonstrated by the evidence here presented."

The Board appealed from each of the superior court's orders. Since each of these appeals challenges the superior court's findings and its authority to impose and oversee the development of a training program for the Board, we ordered that the appeals be considered together for purposes of oral argument and decision. We also stayed all five orders pending the decision on appeal. In these consolidated appeals,[3] we conclude the superior court erred in finding that the specified regulation (Regs., § 2402, subd. (c)) is vague as applied and that the Board is violating the separation of powers doctrine. Accordingly, we shall reverse.

## I.  *Factual and Procedural Background*

A brief summary of the factual and procedural background of each matter follows.

### A.  *The* Bragg *matter (H032045)*

In February 1986, while robbing a gas station, Bragg beat the attendant with a stick, mortally wounding him. From December 1985 to the time of his arrest in March 1986, Bragg also committed four other robberies, armed with a wrench on one occasion and with a two-by-four on the other three occasions. In two of these robberies, Bragg hit his victims on the head with his weapon, knocking them to the ground "in a pool of blood." In the other two robberies, he attempted to hit the victims with his two-by-four, but missed. In 1987, Bragg pleaded guilty to second degree murder (Pen. Code, § 187)[4] and robbery (§ 211) and was sentenced to an indeterminate term of 15 years to life.

---

[3] We ordered the cases considered together on appeal and have taken judicial notice of the records in all five appeals, specifically *In re Bragg* (H032045), *In re Ngo* (H032046), *In re Jameison* (H032047), *In re Criscione* (H032048) and *In re Lewis* (H032044).

[4] Unless otherwise indicated, all further unspecified statutory references are to the Penal Code.

In 2002, the Board of Prison Terms[5] denied parole to Bragg, and in May 2003, Bragg petitioned the superior court for a writ of habeas corpus. The superior court issued an order to show cause on the petition, and subsequently ordered an evidentiary hearing on the issue of whether or not the Board's parole hearing process was "based on a generalized policy of denying parole without truly examining the merits of the [inmate's] case." In preparation for that hearing, the superior court ordered an "examination of the decision pages from the other Board hearings at and around the time of [Bragg]'s [hearing]."

In compliance with the superior court's order, the Board provided copies of the relevant portions of the transcripts of 679 life-term inmates who had parole suitability hearings between July 31, 2002, and October 31, 2002.

B. *The* Ngo *matter (H032046)*

"In 1988, when he was 18 years old, Viet Mike Ngo killed a 14-year-old boy in a drive-by shooting. While a passenger in an automobile traveling on Highway 101, Ngo fired four bullets into a nearby vehicle, striking and fatally injuring the victim. Ngo pleaded guilty to second degree murder (. . . § 187) in 1989, and he was sentenced to 15 years to life in prison." (*Board of Prison Terms v. Superior Court* (2005) 130 Cal.App.4th 1212, 1221 [31 Cal.Rptr.3d 70], fn. omitted.)

In 2003, the Board denied Ngo parole, and in 2004, Ngo filed a petition for a writ of habeas corpus, challenging the 2003 parole denial. In August 2004, the superior court issued an order to show cause, in which it ordered discovery to determine if, in over 90 percent of the cases during the year Ngo's hearing was held, the Board stated the crime was exceptionally or especially callous, dispassionate, calculated or cruel. The Board sought a writ of mandate, prohibition or other relief, which was granted and, in a published decision, this court ordered the superior court to vacate both the order to show cause and the discovery order. (*Board of Prison Terms v. Superior Court, supra*, 130 Cal.App.4th at pp. 1220–1224.)

In December 2005, the superior court issued a new order to show cause, directing the Board to provide transcripts of parole hearings conducted in August, September and October 2003 for inmates serving life terms for murder.

---

[5] The Board of Prison Terms was abolished effective July 1, 2005, and replaced by the Board. (§ 5075, subd. (a).) Depending on the context, "Board" refers either to the parole agency or to the panel of three commissioners that conducted the parole suitability hearing.

In 2006, the Board again denied parole to Ngo. Ngo filed a second petition for a writ of habeas corpus. The superior court again issued an order to show cause directing that Ngo's two petitions be combined for purposes of rendering a final decision, on the grounds that the claims raised in the 2006 petition were similar to those raised in the 2004 petition.

On January 26, 2007, the superior court ordered the Board to provide transcripts of all inmates who had parole hearings in April 2006, "along with the transcript of every hearing in which those inmates were denied parole. For all the inmates who were granted parole, [the Board] is to provide the transcript of the most recent prior hearing at which they were denied parole."

In compliance with the court's order, the Board provided hearing transcripts of 585 life-term inmates[6] who had parole suitability hearings between July 1, 2003, and April 30, 2006.

C. *The* Jameison *matter (H032047)*

In December 1978, Jameison shot the victim twice in the head, killing him. The victim was found lying in bed, and police concluded there had not been a struggle prior to the shooting. Jameison had been living with the victim while Jameison was going through a divorce. In 1979, Jameison was convicted of second degree murder (§ 187) and was sentenced to a term of 15 years to life.

In November 2003, the Board denied parole to Jameison, and in August 2004, Jameison filed a petition for writ of habeas corpus challenging that denial. Again, the superior court issued an order to show cause and, on May 12, 2005, ordered that the Board produce the transcripts "of all inmates incarcerated for first or second degree murder that had parole consideration hearings between and including the dates of October 1, 2003 and December 31, 2003." An examination of these transcripts disclosed that "over 90% of the inmates within the specified three month period were denied parole and for each of them the crime itself was a primary reason." The superior court then ordered the Board to "provide [Jameison] a copy of the transcript of the hearing at which each of these 9-10% non-denied inmates were earlier denied parole." On January 12, 2007, the superior court ordered the Board to produce transcripts from parole hearings for life inmates which took place in

---

[6] The Board provided Ngo with transcripts for 792 inmates, but 200 of these were duplicative of transcripts that had already been provided in connection with the Jameison matter. Seven transcripts were inadvertently produced by the Board and were not examined, as they did not fall within the parameters of the discovery order.

June 2006, because the "sample/point estimate from 2003 may not be not [*sic*] valid for drawing conclusions about the behavior of the Board today." As before, if an inmate was granted parole at a June 2006 hearing, the Board was to provide a copy of the transcript of the prior hearing in which that inmate was denied parole.

The Board produced the hearing transcripts of 762 life-term inmates who had hearings between October 1 and December 31, 2003, in addition to June 2006.

### D.  The Criscione *matter (H032048)*

In 1979, Criscione admitted to killing his girlfriend, whose body was found by police in a water-filled bathtub. "The coroner determined the cause of death to be strangulation and drowning." (*People v. Criscione* (1981) 125 Cal.App.3d 275, 280 [177 Cal.Rptr. 899].)

In 2006, the Board denied parole to Criscione, who subsequently filed a petition for writ of habeas corpus. The superior court issued an order to show cause and, on November 22, 2006, ordered the Board to review the transcripts for inmates who had parole consideration hearings in February 2005 and January 2006 to determine how many of those inmates were denied parole, at least in part, because of the commitment offense. In the event that an inmate was granted parole at a hearing during the relevant timeframe, the Board was to examine the transcript of that inmate's prior parole hearing to determine if the commitment offense was used as a basis for denying parole.

In the Criscione matter, the hearing transcripts of 530 life-term inmates who had hearings in February 2005 and January 2006 were examined. At the June 1, 2007 evidentiary hearing, the Board stipulated that in all these parole hearings, it relied upon the commitment offense as a basis for denying parole.

### E.  The Lewis *matter (H032044)*

"Donald Ray Lewis pleaded guilty to murder in the first degree (§ 187) in 1978. He was sentenced to life with the possibility of parole on the murder count. The murder occurred in 1977 when Lewis had a confrontation with the victim, Allen LaBonte, about a marijuana purchase. Lewis hit LaBonte on the head with a rock, crushing his skull. Lewis then took LaBonte's knife and stabbed him several times in the face and neck. After the stabbing, Lewis drove off in LaBonte's car. LaBonte's body was later discovered in a flood

control channel." (*Board of Prison Terms v. Superior Court, supra*, 130 Cal.App.4th at p. 1226.)

In December 2003, the Board denied parole to Lewis,[7] who subsequently filed a petition for writ of habeas corpus. The superior court ordered the Board to produce the transcripts of all parole hearings conducted from November 2003 through February 2004. For any inmate who was granted parole at a hearing held during the relevant timeframe, the Board was further ordered to provide the transcript of their most recent prior parole hearing at which they were denied parole.

In the Lewis matter, the Board produced the hearing transcripts of 409 life-term inmates who had hearings between November 1, 2003, and February 26, 2004. Of these 409 transcripts, 267 were duplicates of transcripts which had already been examined in the Jameison or Ngo matters; consequently, only 142 additional transcripts were examined.

### F. *The evidentiary hearings*

The evidentiary hearings on the various petitions were held over three days on October 20, 2006, February 23, 2007, and June 1, 2007. For the purposes of the hearings, the superior court took judicial notice of the pleadings and discovery produced in connection with each of the petitions. The petitioners introduced into evidence the results of their analyses of a total of 2,690 parole suitability hearing transcripts conducted during 13 randomly selected months between July 31, 2002, and June 30, 2006.[8]

Karen Symons Rega, a licensed private investigator employed by petitioners' counsel, testified as to the methodology used in reviewing these transcripts. After familiarizing herself with section 3041 and Regulation section 2402, Rega examined the transcripts and "identif[ied] the inmate's CDC number, the charge, whether or not the inmate was denied or approved for

---

[7] The court takes judicial notice of its own records in the pending appeal entitled *People v. Lewis* (H032463). On August 31, 2006, Lewis was granted parole at a subsequent hearing, but the Governor then reversed the Board's decision. Lewis's separate petition for writ of habeas corpus was granted by the superior court, which reinstated the Board's grant of parole, and gave the Governor 30 days to again review Lewis's case. The People appealed, but the Governor declined to conduct a new review and Lewis was released on parole on February 2, 2008. Lewis's motion to dismiss the People's appeal as moot was denied on September 15, 2008.

[8] Specifically, according to the superior court, "[a]ll [Board] decisions in the months of August, September and October of 2002, July, August, September, October, November, and December of 2003, January and February of 2004, February of 2005, and January of 2006 were compiled."

parole, and also identif[ied] the reasons for the denial, if they were denied." Rega was assisted in this task by several law school graduates. Rega described her approach as follows: "I read each transcript, and I focused on the decision pages, trying to isolate certain language in the decision pages that indicated the reason for the denial; and specifically, I was looking for the words 'heinous, atrocious, cruel, dispassionate, calculated, exceptionally, callous, disregard, trivial, and/or inexplicable, the victim was abused, multiple victims.' "

Rega and her assistants prepared a chart which recorded, for each transcript, a brief description of the facts of the commitment offense as well as the language used by the Board to discuss that particular inmate's offense in connection with the decision to grant or deny parole. According to Rega, she and the other members of the team concluded that the commitment offense was a "primary" reason for denying parole if the Board "would say things, such as, the primary reason for denial, the paramount reason for denial, paramount certainly is the commitment offense, first and foremost, things of that nature." Rega also stated that she and her team concluded the commitment offense was a "primary" reason for denying parole if the Board listed the commitment offense first when discussing the reasons for denying parole or if they "spent more time explaining the commitment offense."

On cross-examination, Rega admitted that she and her assistants only recorded reasons for denial which were related to the commitment offense; if the Board related any other reasons for denying parole, such as the inmate's prior criminality, record of violent behavior, history of unstable relationships, failure to profit from prior attempts to correct criminality, lack of realistic parole plans, prison discipline record, etc., those reasons were not noted on the charts. Rega explained this omission as follows: "[T]he objective of our work was to determine whether or not the Board had cited the commitment offense as exceptional, and if we felt it was the primary, or if it was the primary reason for denial. Therefore, it didn't—once we established that they were denied, the crime was described as exceptional, it was the primary reason for rejection. *It didn't seem productive to add any other reason.*" (Italics added.)

At one point during cross-examination, the superior court asked Rega the following question: "Did you—did you make any effort to determine how the Board rationalized or explained its use of the crime in conjunction with the other factors to deny parole? In other words, were you looking for the Board saying, Well, here's our analysis of the crime, and when you consider that in conjunction with certain behavior in prison, after that causes us to believe this person poses a significant risk, did you do anything like that?"

Rega replied, "No. Our exclusive task was to determine if it was denied on the basis of the commitment offense."

Professor Mohammed Kafai, petitioners' expert in the field of statistics, testified that the statistical sample provided by the 2,690 transcripts was large enough to draw statistically significant conclusions about the entire population of life-term inmates currently facing parole eligibility hearings. Professor Kafai opined that, because the Board characterized nearly 100 percent of the commitment offenses as "exceptionally" or "unusually" heinous, atrocious or cruel, then the phrase itself, as a statistical matter, had no significance.

G. *The superior court's August 30, 2007 orders*

On August 30, 2007, the superior court issued five 34-page orders granting habeas corpus relief to the petitioners. In these orders, the court first determined that the regulation addressing the Board's consideration of the commitment offense in parole suitability determinations was not unconstitutionally vague on its face since the "factors in [subdivision (c)(1), subsections] (A)–(E) provide . . . clear limiting construction to the term 'especially heinous, atrocious, or cruel' in [Regulations, section] 2402[, subdivision] (c)."

The superior court turned next to the petitioners' contention that the regulations are unconstitutionally void for vagueness "as applied" by the Board. After reviewing the evidence and the testimony presented at the hearing, the court reasoned that because the Board relied on the commitment offense, at least in part, in all 2,690 instances when it denied parole, the Board had necessarily found that each inmate's crime was "especially heinous, atrocious or cruel" under Regulations, section 2402, subdivision (c). According to the court, "[t]he result of the initial examination was that in over 90 percent of cases the Board had found the commitment offense to be 'especially heinous, atrocious or cruel' as set forth in [Regulations, section 2402, subdivision (c)(1)]. In the remaining 10% of cases either parole had been granted, or it was unclear whether [Regulations, section 2402, subdivision (c)(1)] was a reason for the parole denial. For all such cases, the decisions in the prior hearing for the inmate were obtained and examined. In every case, the Board had determined at some point in time that every inmates' crime was 'especially heinous, atrocious or cruel' under [Regulations, section 2402, subdivision (c)(1)]. [¶] Thus, it was shown that 100% of commitment offenses reviewed by the Board during the 13 months under examination were found to be 'especially heinous, atrocious or cruel' under [Regulations, section 2402, subdivision (c)(1)]." Because, by definition, the term " 'especially' . . . cannot possibly apply in 100% of cases," the court

concluded that the Board's decisions are "made not on the basis of detailed guidelines and individualized consideration." In reaching this conclusion, the court adopted Professor Kafai's findings that, statistically, it was fair to conclude that at *every* parole consideration hearing where an inmate is found unsuitable for parole, the Board makes a finding that the commitment offense is "particularly egregious" or "especially heinous, atrocious or cruel." The superior court reasoned, therefore, that the Board was applying the regulations arbitrarily and thus the regulations were void for vagueness "as applied."

The superior court further found that the Board, by acting as described above, disregards the limits and guidelines placed upon it by section 3041, subdivision (b) and has been "appropriating" to itself absolute power over parole matters, in violation of the separation of powers doctrine. The court concluded that the only way the Board could lawfully perform its duties was if it were compelled to "identify the logical connection between the facts upon which it relies and the specific criteria found to apply in the individual case." To that end, the superior court directed the Board to "develop, submit for approval, and then institute a training policy for its members based on the current and expanding body of published state, and federal, case law reviewing parole suitability decisions, and specifically the application of [Regulations,] § 2402 criteria [not limited to subdivision (c)(1)]." Although it acknowledged that the "showing and analysis in this case was limited to [Regulations,] § 2402[, subdivision] (c)(1)," the superior court found that "the conclusions that the evidence compelled, that the Board has been carelessly distorting and misapplying the regulations, is [*sic*] not so limited. Accordingly, the training program that is necessary for the Board [cannot] reasonably be limited to just [Regulations,] § 2402[, subdivision] (c)(1). Thus, to the extent case law recognizes, clarifies and establishes remedies for other due process violations they must also be incorporated into the necessary rules and training the Board is required to abide by." The superior court reserved jurisdiction to review and approve the Board's newly developed rules, regulations and training program, and once this court-approved regime was in place, petitioners were to then be given new parole hearings.

## II. *Discussion*

### A. *Standard of review*

The challenged order is in the nature of an injunction as it directs the Board to develop and implement a comprehensive training program, complete with continuing legal education, for its commissioners. Ordinarily, when

reviewing an order granting injunctive relief, we apply the deferential abuse of discretion standard. (See *ReadyLink Healthcare v. Cotton* (2005) 126 Cal.App.4th 1006, 1016 [24 Cal.Rptr.3d 720].) The superior court's decision will be reversed only when it exceeds the bounds of reason or disregards uncontradicted evidence. (*Ibid.*)

### B. *The statutory and regulatory framework for parole hearings*

In the case of an inmate sentenced to life in prison, one year prior to the inmate's minimum eligible parole release date a panel of commissioners of the Board shall meet with the inmate and "shall normally set a parole release date." (§ 3041, subd. (a).) Parole considerations applicable to life prisoners convicted of murder are contained in Regulations, section 2400 et seq.

Regulations, section 2402, guides the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. (Regs., § 2402, subd. (a).)[9] The regulation also lists several circumstances relating to *unsuitability* for parole[10]—such as the heinous, atrocious, or cruel nature of the crime, or an unstable social background; and *suitability* for parole—such as an inmate's rehabilitative efforts, demonstration of remorse, and the mitigating circumstances of the crime.[11] (Regs., § 2402, subd. (d).) Finally, the

---

[9] The Board is expected to consider "[a]ll relevant, reliable information available . . . . Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Regs., § 2402, subd. (b).)

[10] Unsuitability factors are (1) a commitment offense carried out in an "especially heinous, atrocious or cruel manner"; (2) a "[p]revious [r]ecord of [v]iolence"; (3) "a history of unstable or tumultuous relationships with others"; (4) "[s]adistic [s]exual [o]ffenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "[t]he prisoner has engaged in serious misconduct in prison or jail." (Regs., § 2402, subd. (c)(1)–(6).) Factors supporting a finding that the inmate committed the offense in an especially heinous, atrocious, or cruel manner include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. (Regs., § 2402, subd. (c)(1).)

[11] Suitability factors are (1) the absence of a juvenile record; (2) "reasonably stable relationships with others"; (3) signs of remorse; (4) the crime was committed "as the result of

regulation explains that the foregoing circumstances "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Regs., § 2402, subds. (c), (d).)

"Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Regs., § 2402, subd. (a).)

C. *The superior court did not err in addressing a constitutional challenge to the regulations as that challenge was expressly or implicitly raised in the petitions for habeas corpus relief*

As we have previously noted, only claims that are expressly or implicitly raised in the original or a supplemental petition for writ of habeas corpus may be adjudicated by the superior court. (*Board of Prison Terms v. Superior Court, supra*, 130 Cal.App.4th at p. 1237.) The Board herein objects to the superior court's orders on the grounds that the petitions below did not claim that the parole regulations are unconstitutionally vague, either on their face or "as applied." We disagree.

The petitions are replete with allegations that the Board is acting in an arbitrary and capricious manner in making parole suitability determinations, and that it is implementing a "no parole" policy in violation of section 3041. While none of the petitions expressly claim that the regulations are vague, or vague "as applied" by the Board, the failure to include those specific words in the petitions is not dispositive. The "superior court in crafting the order to show cause has the power to explain its preliminary assessment of the petitioner's claims [and] restate inartfully drafted claims for purposes of clarity . . . ." (*Board of Prison Terms v. Superior Court, supra*, 130 Cal.App.4th at p. 1239.) The superior court did so here, and it is apparent from the record that the Board had notice of and an opportunity to respond to the issues as framed by the orders to show cause.

D. *In evaluating how the parole regulations are applied by the Board, the superior court failed to construe the regulations as a whole*

■ "[A]n as applied challenge assumes that the statute or ordinance violated is valid and asserts that the manner of enforcement against a

---

significant stress in [the prisoner's] life"; (5) battered woman syndrome; (6) the lack of "any significant history of violent crime"; (7) "[t]he prisoner's present age reduces the probability of recidivism"; (8) "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release"; and (9) the inmate's "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d)(1)–(9).)

particular individual or individuals or the circumstances in which the statute or ordinance is applied is unconstitutional." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1089 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) "[An as applied challenge] contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right." (*Id.* at p. 1084.)

In determining whether or not an inmate is suitable or unsuitable for parole, "[t]he relevant determination for the Board . . . is, and always has been, an individualized assessment of the continuing danger and risk to public safety posed by the inmate. If the Board determines, *based upon an evaluation of each of the statutory factors as required by statute*, that an inmate remains a danger, it can, and must, decline to set a parole date." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1227 [82 Cal.Rptr.3d 169, 190 P.3d 535], italics added.) Further, "[i]t is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*Id.* at p. 1212.) What this means is that the Board's findings that certain suitability or unsuitability factors, e.g., whether or not the commitment offense was "especially heinous, atrocious or cruel," exist in a particular case are secondary to the Board's analysis and explanation of how those factors combine to support its ultimate decision to either grant or deny parole to a particular inmate.

Viewed through this analytical lens, the shortcomings of the superior court's orders become apparent. In its orders, the superior court takes the Board to task for finding 100 percent of the commitment offenses reviewed to be "especially" heinous, atrocious or cruel, noting that the term "especially," by definition, cannot be used to describe 100 percent of anything.[12] In the view of the superior court, this logical inconsistency demonstrates the Board's failure to "operate within the limiting construction of the regulations," and its propensity to do "violence to the requirements of due process

---

[12] The California Supreme Court has acknowledged "there are few, if any, murders that could *not* be characterized as . . . particularly aggravated . . . ," and, further, notes that the commitment offense is found to be "particularly egregious . . . in nearly every murder case considered by the Board . . . ." (*In re Lawrence, supra*, 44 Cal.4th at pp. 1218, 1219.) Regardless, "the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor." (*Id.* at p. 1221.) Accordingly, the Board's seemingly reflexive invocation of this particular unsuitability factor, in and of itself, does not amount to a "systematic abuse of discretion and distortion of [due] process."

and individualized consideration which are paramount to the appropriate exercise of its broad discretion."

If the Board's analysis of an inmate's parole suitability depended *solely* upon a finding that the inmate's commitment offense was "especially heinous, atrocious or cruel" and the Board routinely made such a finding, this would present compelling evidence that the Board was undertaking a formulaic application of the parole suitability regulations in violation of inmates' due process rights. However, the regulations direct the Board to consider many factors before determining whether or not a particular inmate is suitable for parole—whether or not the commitment offense was or was not "especially heinous, atrocious or cruel" is but one of those factors. For petitioners and the superior court, it was enough that the Board characterized most or all of the commitment offenses as "especially" heinous, atrocious or cruel. Conceding that this is a linguistically illogical approach, the salient question remains: In finding an inmate unsuitable for parole, does the Board fail to demonstrate how all the applicable regulatory factors interrelate to support its conclusion that the inmate is currently dangerous to society?

The superior court's orders do not answer that question because petitioners' evidence was limited to calculating how often the Board characterized the commitment offense as "especially heinous, atrocious or cruel." If the Board cited any reasons for denying parole, apart from the commitment offense, those additional reasons were ignored and were not recorded on the charts offered into evidence by petitioners. When Rega was asked by the superior court if she and her research assistants made "any effort to determine how the Board rationalized or explained its use of the crime in conjunction with the other factors to deny parole," she responded, "No. Our exclusive task was to determine if [parole] was denied on the basis of the commitment offense." In fact, as Rega herself testified, out of all the transcripts examined, there was no case "in which the Board used the commitment offense and no other reason for denying parole."

Again, in reviewing the Board's decision that an inmate is not suitable for parole, the question is whether or not the Board's conclusion that a particular inmate poses a current danger to society is supported by the Board's analysis of the various unsuitability and suitability factors, not whether or not the Board habitually describes all commitment offenses as "especially heinous, atrocious or cruel." (See *In re Lawrence, supra,* 44 Cal.4th at p. 1212.) In the course of the proceedings below, the superior court seems to have lost sight of the trees for the forest. In finding that the Board's application of the parole regulations is unconstitutionally vague because it "is implicit in [Regulations,] § 2402 . . . [that] the qualifier 'especially,' in 'especially heinous, atrocious or cruel,' requires that some form of comparison [of commitment offenses] be made," the superior court seems to endorse

the notion of comparative analysis, an approach which the California Supreme Court has rejected. (See *In re Dannenberg* (2005) 34 Cal.4th 1061, 1084 [23 Cal.Rptr.3d 417, 104 P.3d 783] ["[D]etermination of suitability for parole involves a paramount assessment of the public safety risk posed by the particular offender, without regard to a comparative analysis of similar offenses committed by other persons."].)

As the California Supreme Court recently noted, "[f]ocus upon whether a petitioner's crime was 'particularly egregious' in comparison to other murders in other cases is not called for by the statutes, which contemplate an individualized assessment of an inmate's suitability for parole, nor is it a proper method of assessing whether 'some evidence' supports the Governor's conclusion that a particular inmate represents an unreasonable threat to public safety. The circumstance that some inmates who committed murders were or were not adjudged to be threats to public safety has a minimal bearing upon whether any *other* inmate poses such a threat. . . . [T]he statute does not require the Board to compare the inmate's actual period of confinement with that of other individuals serving life terms for similar crimes. [Citation.] Rather, the statutory suitability determination is individualized, and focuses upon the public safety risk posed by the particular offender." (*In re Lawrence, supra,* 44 Cal.4th at p. 1217.)

    E.   *On remand, the superior court must give individual consideration to the merits of each petition for writ of habeas corpus*

■    As explained above, we find that the evidence presented below does not support the superior court's findings that the Board is violating the separation of powers doctrine, and that the specified regulation (Regs., § 2402, subd. (c)) is vague as applied. However, we do not express an opinion on the merits of the individual habeas corpus petitions at issue herein, and therefore will remand those matters to the superior court for its consideration. On remand, in evaluating the individual petitions for habeas corpus relief, the superior court should keep in mind the appropriate standard of review, namely that "the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board . . . ." (*In re Lawrence, supra,* 44 Cal.4th at p. 1221.) There is nothing inherently improper about the Board basing "a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety." (*Ibid.*)

III.  *Disposition*

The orders granting habeas corpus relief are reversed. The matters are remanded to the superior court for consideration of the merits of the individual petitions for writs of habeas corpus in accordance with *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535].

Rushing, P. J., and Elia, J., concurred.

The petitions of respondents Donald Ray Lewis, Morris L. Bragg, Donnell Eugene Jameison and Arthur L. Criscione for review by the Supreme Court were denied July 8, 2009, S172105.