[No. A125182. First Dist., Div. Three. June 8, 2010.]

In re ROBERT SHIPPMAN on Habeas Corpus.

## COUNSEL

Benjamin Ramos, under appointment by the Court of Appeal, for Petitioner Robert Shippman.

Edmund G. Brown, Jr., Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Brian C. Kinney, Deputy Attorneys General, for Respondent State of California.

## OPINION

**JENKINS, J.**—This matter involves a petition for writ of habeas corpus. Inmate Robert Shippman,[1] serving an indeterminate life sentence for the second degree murder of his wife, challenges as contrary to the evidence a decision by the Board of Parole Hearings that he remains an unreasonable risk to public safety and, thus, unsuitable for parole. For reasons we will explain, we deny the petition.

---

[1] In the record, petitioner's name is sometimes spelled "Shippman," and other times is spelled "Shipman." We adopt the former spelling, "Shippman," which is the one used in the petition for writ of habeas corpus.

## FACTUAL AND PROCEDURAL BACKGROUND

I.  *The Commitment Offense.*

On April 23, 1993, Shippman (petitioner) fatally shot his third wife, Juli, and then immediately turned the gun on himself, inflicting serious but nonfatal wounds. At this time, petitioner, age 55, and Juli, age 28, were separated. Juli wanted out of the marriage and was having an extramarital affair with a local police officer, her second such affair during the couple's two-year marriage. Petitioner was taking Valium to alleviate the stress and anguish he suffered from the breakdown of his marriage.

About a month before the murder, petitioner had arranged to take Juli to breakfast in Calistoga so they could discuss their marital problems. However, petitioner refused to stop in Calistoga as planned, and instead drove Juli on to Ukiah, where he forced her to talk to him for about four hours. Juli later obtained a restraining order against him.

Nonetheless, according to petitioner, on the day of her murder, Juli agreed to come to his house to pick up her mail, which he said would be left on the porch. Petitioner also stated that Juli then agreed to go for a ride in his truck, during which time he intended to convince her to end her extramarital affair. The estranged couple stopped near Howell Mountain Road, where they talked for about 10 or 15 minutes, at which time Juli told petitioner she was leaving to call her lover. Petitioner, angered by Juli's statement, retrieved a rifle he kept in his truck for hunting trips, and shot her three times, twice in the chest and once in the back of the head. He then shot himself three times, twice in the chest and once in the head.

Later that morning, petitioner's friend, who had been staying at petitioner's house, found Juli's vehicle parked on a nearby street, still running and with her purse inside.

According to statements made by Juli's brother to police shortly after her murder, petitioner and Juli had been having marital difficulties for months and she was "terrified" to be alone with him. Further, petitioner had recently forced Juli to go with him to Ukiah, where he had been "extremely violent towards her." Consistent with these statements, a probation report submitted in the case noted "a number of police reports at the department relating to the events surrounding [the couple's] separation and of the problems they were having."

In September 1993, petitioner pleaded guilty to second degree murder, with an enhancement for use of a firearm, and was sentenced to an indeterminate term of 15 years to life in prison, plus four additional years for the enhancement. Petitioner's minimum parole eligibility date was scheduled for August 15, 2005.

## II. *Petitioner's Personal Background.*

Petitioner was raised on a chicken farm in central California by his mother and father with 10 older siblings. Petitioner's parents remained married, and provided well for their large family. His father worked as a rancher and then, upon his retirement, became a local pastor. Petitioner recalls a happy, stable childhood, with no issues of emotional or physical abuse, substance abuse, disciplinary problems or medical problems of any kind. Petitioner had no juvenile record or criminal record aside from his commitment offense.

Petitioner graduated from high school and attended one year of college before meeting and marrying his first wife and leaving school to gain employment. Petitioner divorced his first wife, with whom he has one daughter, after seven years of marriage when she became pregnant by one of his best friends. Petitioner denies any history of physical or emotional abuse in his first marriage, but admits hitting his first wife's lover in the head with a baseball bat, "put[ting] him in the hospital."

Two years after divorcing his first wife, petitioner married his second wife, with whom he shares a daughter and stepson. As with his first marriage, petitioner denies any history of physical abuse or emotional abuse in his second marriage, but admits "there was one [incident] with my [second] wife," which stemmed from the couple's disagreement over how best to handle their son's drug abuse. Petitioner's second marriage ended after 22 years, when he had an extramarital affair with Juli, his eventual third wife and the victim in this case.

Prior to his incarceration, petitioner was continuously employed as a plumbing contractor and owner of a plumbing company, and as the owner of a gas station. He had no problems with alcohol or drug abuse or history of mental problems.

## III. *Petitioner's Incarceration.*

While serving his indeterminate sentence, petitioner has completed certificates in vocational plumbing and carpentry, and obtained skills in vocational electricity. In addition, he has worked as a plumber, and voluntarily taught

basic plumbing and electricity skills to other inmates. His work reports have all been satisfactory or above average.

Petitioner has had no disciplinary problems while incarcerated, and has participated in one 44-week anger management course and one 14-week self-help course entitled "Awareness and Empathy for Survivors of Crime." He has also become a self-described born-again Christian, taught Bible study, and coached softball.

Petitioner has undergone at least two psychological evaluations during his incarceration. The results of both were favorable and supportive of his release. For example, a 2004 evaluation concluded that, "based upon his years of incarceration, the maturity he has gained over those years, his deep sense of sorrow and remorse about the commitment offense, his ever-deepening aware-ness of spiritual truths, and the fact that he has learned that he must not take things into his own hands when disaster strikes, he actually poses less of a threat to society than the average citizen."

The most recent evaluation, prepared in 2008 in connection with this latest effort at parole, describes petitioner, now age 70, as being at a "very low" risk for future violence. The 2008 evaluation further notes that petitioner has "programm[ed] in an excellent fashion" during his incarceration and "shows no indications of psychopathy." When asked to describe his strengths, petitioner identified his faith in God; when asked about his weaknesses, he identified "too many sweets."

## IV. *Petitioner's Parole Hearings and Board Decisions.*

In September 2004, petitioner participated in his first parole hearing, after which a panel of hearing officers from the Board of Parole Hearings (the Board) denied parole for four years, finding him unsuitable for release.

On October 22, 2008, petitioner's second parole hearing (known as the "first subsequent parole hearing") was held. At this hearing, the presiding commissioner questioned petitioner at length regarding his suitability for parole, touching on, among other topics, Juli's murder; his social history, including his three failed marriages; his accomplishments during incarcera-tion; and his future plans. In addition, the district attorney questioned petitioner in greater detail regarding "control issues" he experienced in his relationships with Juli and his other wives, and any efforts he has made while incarcerated to address this antisocial behavior.

Following this hearing, the Board decided petitioner remained unsuitable for parole because he continued to pose an unreasonable risk of danger to

public safety. The Board based its decision on the following grounds: (1) the commitment offense was particularly aggravated in nature; (2) petitioner lacks insight into what caused him to commit the offense and to otherwise engage in controlling behavior; (3) he has an unstable social history; and (4) his parole plans are "marginal." Of particular concern to the Board was petitioner's apparent ignorance of the factors that "trigger" his irrational need to control others, the behavior that led him to commit murder. The Board expressed optimism, however, regarding petitioner's exemplary disciplinary record while incarcerated and his lack of a juvenile or other criminal record, and encouraged him to participate in additional self-help programs to better prepare him for release. Accordingly, the Board denied parole for three additional years.

On April 1, 2009, petitioner filed a petition for writ of habeas corpus in superior court. On May 4, 2009, the superior court denied his petition, finding the Board's denial of parole adequately supported by the evidence in the record. Petitioner then filed for habeas corpus relief in this court.

We issued an order to show cause and appointed counsel for petitioner, after concluding based on the factual allegations in his petition that he may be entitled to habeas corpus relief. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474–475 [37 Cal.Rptr.2d 259, 886 P.2d 1252].) In compliance with this order, the prosecution filed a timely return, and petitioner thereafter filed a traverse responding to the issues raised therein. With this factual and procedural background, we now turn to the relevant law.

## DISCUSSION

The sole issue before us is whether petitioner is entitled to habeas corpus relief from the Board's finding that he was unsuitable for parole. The relevant legal principles, most of which have been codified, are as follows.

I. *The Legal Framework: Suitability for Parole.*

■ Under Penal Code section 3041, the governing statute, the Board is normally required, one year before an inmate's minimum eligible parole release date, to set a parole release date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public . . . ." (Pen. Code, § 3041, subd. (a).) Specifically, the Board must set a parole release date unless it determines that public safety requires a lengthier period of incarceration for the inmate given the gravity of the commitment offense. (Pen. Code, § 3041, subd. (b); see also *In re Shaputis* (2008) 44 Cal.4th 1241, 1257–1258 [82 Cal.Rptr.3d 213, 190 P.3d 573].)

Consistent with section 3041, the governing regulations require the Board to determine whether an inmate is suitable for parole after considering "[a]ll relevant, reliable information available to the panel . . . ." (Cal. Code Regs., tit. 15, § 2402, subd. (b).) "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole *if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.*" (*Id.*, § 2402, subd. (a).)

■ Factors set forth under the governing regulations that demonstrate an inmate's suitability for parole include: (1) lack of juvenile record; (2) stable social history; (3) signs of remorse; (4) motivation for the crime (e.g., whether the inmate committed the crime as the result of significant stress in his life); (5) experience of battered woman syndrome; (6) lack of criminal history; (7) present age; (8) plans for release; and (9) institutional behavior. (Cal. Code Regs., tit. 15, § 2402, subd. (d).) Factors demonstrating an inmate's unsuitability for parole include: (1) the nature of the commitment offense; (2) previous record of violence; (3) unstable social history; (4) commission of sadistic sexual offenses; (5) psychological factors (e.g., whether the inmate has a lengthy history of severe mental problems related to the offense); and (6) institutional behavior. (Cal. Code Regs., tit. 15, § 2402, subd. (c).)

In considering these factors, "the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Cal. Code Regs., tit. 15, § 2402, subds. (c), (d).) The Board must keep in mind, however, that " 'parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation.' ([*In re*] *Rosenkrantz* [(2002) 29 Cal.4th 616,] 654 [128 Cal.Rptr.2d 104, 59 P.3d 174] . . . .)" (*In re Shaputis, supra,* 44 Cal.4th at p. 1258.)

II. *The Standard Governing Review of Board Parole Decisions.*

■ On appeal, only limited grounds exist for overturning a Board's decision regarding a particular inmate's suitability for parole. Specifically, if there is "some evidence" supporting the Board's decision, we will not disturb it on appeal. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1212 [82 Cal.Rptr.3d 169, 190 P.3d 535]; *In re Shaputis, supra,* 44 Cal.4th at p. 1254.) However, "because the paramount consideration for . . . the Board . . . is whether the inmate currently poses a threat to public safety, and because the inmate's due process interest in parole mandates a meaningful review of a denial-of-parole decision, the proper articulation of the standard of review is whether there exists 'some evidence' that an inmate poses a current threat to public safety,

rather than merely some evidence of the existence of a statutory unsuitability factor," to support the Board's decision. (*In re Shaputis, supra,* 44 Cal.4th at p. 1254.) "It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*In re Lawrence, supra,* 44 Cal.4th at p. 1212; see also *In re Lee* (2006) 143 Cal.App.4th 1400, 1409 [49 Cal.Rptr.3d 931] ["[s]ome evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety"].)

In applying this standard, the reviewing court must affirm the Board's reading of the evidence so long as it is reasonable and based upon due consideration of the relevant legal factors. (*In re Shaputis, supra,* 44 Cal.4th at p. 1258; *In re Singler* (2008) 169 Cal.App.4th 1227, 1238 [87 Cal.Rptr.3d 319].) However, while this standard is "highly deferential," requiring just a "modicum of evidence," it "certainly is not toothless." (*In re Lawrence, supra,* 44 Cal.4th at pp. 1204–1205, 1210.) "If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*In re Rosenkrantz, supra,* 29 Cal.4th 616, 658.)

## III. *The Board's Decision and the Supporting Evidentiary Record.*

Here, the Board found petitioner not suitable for parole after determining that he remained a threat to public safety. In making this determination, the Board relied upon the following: (1) the aggravated nature of his commitment offense; (2) his lack of insight into the offense's causative factors; (3) his unstable social history (and, in particular, a pattern of "control issues" he had with respect to his romantic partners); and (4) his marginal parole plans. Thus, applying the legal principles set forth above, we must decide whether "some evidence" supports the Board's reliance on these factors to deny petitioner parole. (*In re Shaputis, supra,* 44 Cal.4th at p. 1255.)

### A. *The Commitment Offense.*

■ Under the governing regulations, when deciding whether an inmate is suitable for parole, the Board may consider whether the inmate committed the underlying offense in an especially heinous, atrocious or cruel manner. In particular, the Board may consider whether the offense had multiple victims, whether it was carried out in a dispassionate and calculated manner, whether the inmate acted with exceptionally callous disregard for human suffering, and whether the inmate's motive was inexplicable or very trivial. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)

However, as the California Supreme Court has clarified, the Board "may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety. [Citation.] Accordingly, the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board . . . ." (*In re Lawrence, supra*, 44 Cal.4th at p. 1221.) "This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude. ([*In re*] *Rosenkrantz, supra*, 29 Cal.4th at p. 682 . . . .)" (*Ibid.*; see also *In re Shaputis, supra*, 44 Cal.4th at p. 1255.)

Here, the Board found petitioner's commitment offense particularly grave because it was "done in a dispassionate and somewhat calculated manner" and "in a manner which demonstrated exceptional callous disregard for human suffering." The Board also found that petitioner did not act in the heat of the moment upon discovering Juli's extramarital affair. Rather, petitioner knew Juli wanted a divorce and was seeing someone else when he used a "false pretense" to lure her into his vehicle, in which he carried a rifle. Petitioner thereafter "pulled the trigger three times just to kill the victim."

Petitioner claims the Board's reliance on his commitment offense to deny parole was improper, arguing that the fact that he "shot and killed his unfaithful spouse" does not prove he remains a risk to public safety.

Petitioner is no doubt correct that the circumstances of the commitment offense and other immutable aspects of an inmate's history are relevant to the inmate's suitability for parole only to the extent they prove his or her current dangerousness. (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 682; *In re Lawrence, supra*, 44 Cal.4th at p. 1221.) He is likewise correct that, as a general matter, an inmate's commission of an offense "while under the stress of an emotional love triangle" will not, without more, render the inmate unsuitable for parole. (*In re Lawrence, supra*, 44 Cal.4th at pp. 1225–1226; see also *In re Singler, supra*, 169 Cal.App.4th at pp. 1235–1236; *In re Scott* (2004) 119 Cal.App.4th 871, 890, fn. 9 [15 Cal.Rptr.3d 32].) However, we disagree with petitioner's suggestion that, in this case, the Board relied upon the circumstances of his commitment offense when denying parole without giving due consideration to other relevant legal factors, including, as petitioner points out, his rehabilitation efforts, advanced age, stable employment

history, favorable psychological evaluations and lack of a juvenile record or other criminal record. Rather, the record reflects that the Board was well aware of its legal duty under *In re Lawrence, supra*, 44 Cal.4th 1181, to articulate a "rational nexus" between the circumstances of petitioner's offense and his current dangerousness. Indeed, the Board stated as much on the record. Whether the Board did so successfully—in other words, whether its proposed nexus between the commitment offense and petitioner's current dangerousness was sufficient to meet the "some evidence" standard—requires a closer look at the record, which we will now undertake. (*In re Lawrence, supra*, 44 Cal.4th at p. 1221.)

### B. *Petitioner's Unstable Social History and Lack of Insight.*

■ In seeking to articulate a rational nexus between petitioner's commitment offense and his current dangerousness, the Board relied primarily on two factors—petitioner's unstable social history with respect to his relationships with women, and his lack of insight into the factors that caused the offense (to wit, his need to control his relationships with these women). "An '[u]nstable [s]ocial [h]istory,' which is defined as 'a history of unstable or tumultuous relationships with others,' is one circumstance tending to show unsuitability. ([Cal. Code Regs., tit. 15,] § 2402, subd. (c)(3).)" (*In re Roderick* (2007) 154 Cal.App.4th 242, 267 [65 Cal.Rptr.3d 16].) As petitioner and Acting Presiding Justice Pollak, dissenting, correctly note, an inmate's unstable social history, like his commitment offense, is an "immutable" fact, and thus insufficient by itself to prove unsuitability. However, where, as here, social history is considered in conjunction with other suitability factors, such as the inmate's failure to gain insight into his or her antisocial behavior, it may indeed support a Board's decision to deny parole. (*In re Shaputis, supra*, 44 Cal.4th at pp. 1255, 1260–1261.)

Here, the Board found that, while petitioner recognized having "control issues" in his relationships with women, he could not offer a satisfactory explanation as to why. Petitioner told the Board that his controlling behavior may stem from growing up with a controlling father, but offered no further insight. The Board thus remained concerned that, without a deeper understanding of what triggers his extreme and sometimes violent controlling behavior, petitioner would return to it upon his release, particularly if he became romantically involved with other women. As the Board noted, petitioner had a healthy physique and youthful appearance for his age, and "could go back out there and do the same thing, without knowing the reasons as to why [he] committed this crime."

Our review of the record confirms that petitioner acknowledged having "control issues" with his previous romantic partners. Specifically, when the

Board asked petitioner why he murdered Juli, he responded, "I always thought I could control things, and with the others, perhaps I did, but with Juli I couldn't." Petitioner then explained that, when Juli fell in love with someone else, "that hurt and it turned to jealousy, and jealousy is part of control, which is terrible." Ultimately, petitioner acknowledged that "my trying to control her was wrong. I've taken classes to prove that, and that was a terrible, terrible situation." "[Y]ou can get over those [issues] by realizing that that is wrong, control issues over anybody. You can't control another person's love or affection."

Petitioner claims this testimony shows he has addressed his past problems with trying to control the women in his life. We acknowledge much of his testimony appears quite reflective and forthcoming with respect to these problems. However, in determining whether "some evidence" supports the Board's contrary decision, we must consider not only self-selected portions of petitioner's testimony, but the record as a whole. As the Board noted, and contrary to our dissenting colleague's opinion, there is indeed other evidence in this record sufficient to at least raise an inference that petitioner remains dangerous because he has not yet gained insight into or taken full responsibility for his irrational need to control the love and affection of others. Our role on appeal is simply to identify this evidence, not to reweigh it. (*In re Criscione* (2009) 180 Cal.App.4th 1446, 1458 [103 Cal.Rptr.3d 549].)

For example, petitioner acknowledged that he "always thought [he] could control things . . . with the others," but then responded, "No," when asked whether control was "a factor in your prior relationships." Petitioner also denied any incidents of "physical abuse or emotional abuse" in his other marriages, yet, when probed, ultimately admitted to "one incident" involving his second wife, stemming from the couple's disagreement over how best to handle their son's drug problem. Further, the record suggests the existence of other such incidents of abuse.[2] For example, petitioner admitted beating his first wife's lover to the point of hospitalization with a baseball bat after learning about the extramarital affair. While this violence was not aimed directly at petitioner's first wife, it undoubtedly evidences what our dissenting colleague has labeled petitioner's "chronic problem with close emotional relationships with women."

---

[2] The dissent takes us to task for "impl[ying]," without record support, "that Shippman acknowledged abusing his second wife." (Dis. opn., *post*, at p. 486.) Recalling that we must affirm the Board's interpretation of the evidence "so long as that interpretation is reasonable and reflects due consideration of all relevant statutory factors" (*In re Shaputis, supra*, 44 Cal.4th at p. 1258), we stand by our conclusion that petitioner's testimony that there was "one incident where [emotional or physical abuse] happened" "with my [second] wife" amounts to just that—an acknowledgement that petitioner abused his second wife.

Petitioner's testimony regarding his relationship with Juli casts further doubt on his denial of having emotionally or physically abused his former wives, and thus, by inference, on his denial that he would, if released, revert to such behavior in other romantic relationships. In particular, when asked to explain why he and Juli separated, petitioner admitted only that "[s]he wanted out of the marriage would be my guess." He also denied, as with his other wives, any incidents of violence in his marriage with Juli with the exception of her murder. However, as the district attorney noted, a probation report written in connection with Juli's murder noted there "were a number of police reports at the department relating to the events surrounding [petitioner's and Juli's] separation and of the problems they were having." This report also noted that Juli's brother told police shortly after her murder that she "was terrified of going to [petitioner's] house by herself," and that petitioner had recently forced her to go to Ukiah with him, during which time he was "acting extremely violent towards her."

This trip to Ukiah preceded Juli's successful application for a restraining order against petitioner in the weeks before her murder. Yet when asked why Juli had obtained this order, appellant claimed he did not "know how to answer that." Petitioner also denied forcibly taking Juli to Ukiah, claiming, "I did not take her forcibly. I know the incident you're talking about, when we went and we were going to go out for breakfast, and we were going to go to Calistoga. But you're right, instead of me stopping in Calistoga, I kept going [to Ukiah]." Yet when asked whether Juli voluntarily went beyond Calistoga with him, petitioner responded: "Probably not." Petitioner then reluctantly agreed that he "forcibly took her, because she didn't want to go that far with [him]," which "could have been" why she got the restraining order. He also reluctantly agreed that "[Juli] was . . . afraid [of me]," yet continued to deny her purported statements to police that he sexually abused her and threatened to shoot her during the Ukiah trip. Finally, when asked why he shot Juli three separate times leading to her death, petitioner responded: "I don't know the answer to that, sir."

■ This record, we conclude, when considered as a whole, provided the Board with a reasonable basis for finding that petitioner lacked insight into why he has engaged in violence as a means to attempt to control his romantic partners—the behavior apparent in his unstable relationships with his former wives, as well as in Juli's murder. Specifically, the evidence supports inferences by the Board that (1) petitioner has a serious problem with wanting to maintain control over the women in his life; (2) this problem has repeatedly manifested itself in the form of emotional or physical abuse directed toward these women; (3) petitioner is not yet willing to take full responsibility for this pattern of abusive conduct; and (4) petitioner's failure to take full responsibility for his abusive conduct indicates a lack of insight into the root causes of his crime.

Further, while the record reflects that petitioner has indeed taken steps while incarcerated to address this antisocial behavior, by participating in one anger management course and one victim empathy program, the Board also had a reasonable basis for finding that these steps were simply a "building block," which would need to be expanded upon before petitioner can develop the necessary skills to prevent further violence. Indeed, had petitioner already developed these skills, we believe that, when testifying before the Board, he would not have repeatedly denied or minimized the incidents in his past in which his controlling nature toward women resulted in emotional or physical violence. At the very least, petitioner's repeated denials or downplaying of the facts in this regard support an inference that he remains a threat to public safety.

In reaching these conclusions, we acknowledge the two recent psychological evaluations of petitioner that were supportive of his release. The record reflects, however, that the Board discounted the probative value of those evaluations based upon petitioner's failure to "open up" to the clinicians regarding the true nature and extent of his controlling behavior. Having reviewed the record, we believe the Board's decision in this regard was permissible.

Specifically, we note that, when asked by the district attorney whether, during those evaluations, he mentioned his past problems with attempting to control his romantic partners, petitioner responded: "I believe we discussed it at one of these." Yet the evaluations themselves do not reflect any substantive discussion of the issue, at least not to the extent the circumstances require given the link between petitioner's controlling behavior and his violence towards women (including Juli).

For example, the 2004 evaluation describes Juli's murder as an "impulsive" act "related to his serious marital problems, deep emotional anguish, and beclouded thinking due to the Valium he was taking to help control these turbulent emotions." Further, the 2004 evaluation concludes "there are no risk factors" that would cause him to engage in further violence. However, it fails to mention several notable events leading up to Juli's murder that clearly exhibit petitioner's dangerously controlling behavior toward women, including his kidnapping of Juli and her subsequent decision to obtain a restraining order against him. It also fails to discuss petitioner's previous marriages beyond mentioning that they ended in divorce.

The 2008 evaluation, in turn, notes that petitioner had only three relationships with women in his life (apparently each of his marriages), and that his "relationships have been unstable." The 2008 evaluation describes his offense as "an impulsive act of violence that appeared to be out of an act of passion,"

but, unlike the 2004 evaluation, recognizes that, "[s]hould the inmate act in passion or violence in the future, it would increase his violence risk." Nonetheless, the 2008 evaluation joins the 2004 evaluation in its failure to analyze the one aspect of petitioner's personality that is suspected to have contributed to his failed relationships *and* his commission of murder—his irrational need to control romantic partners. Indeed, as the Board noted, in the 2008 evaluation's section entitled "Insight/Self Assessment," petitioner identifies only one "weakness"—"too many sweets."

■ We acknowledge that "expressions of insight and remorse will vary from prisoner to prisoner and . . . there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior." (*In re Shaputis, supra,* 44 Cal.4th at p. 1260, fn. 18.) Here, however, we do not believe the Board's finding that petitioner lacked insight stemmed from any failure on his part to adequately articulate why he committed the offense or what he has since learned from it. Rather, the Board's finding stemmed from petitioner's obvious reluctance at the hearing to take full responsibility for his repeated attempts to control women through abusive means, which, despite his contrary testimony, did not begin and end with Juli's murder. (Cf. *In re Roderick, supra,* 154 Cal.App.4th at pp. 270–271 [reversing a denial of parole where, despite "his inability to articulate a more insightful explanation," the inmate expressed genuine remorse for the crime and acknowledged after several years of claiming self-defense that it was intentional].)

The circumstances of this case distinguish it from those cases relied upon by petitioner in seeking relief from the Board's decision. For example, in one case cited by petitioner, *In re Singler, supra,* 169 Cal.App.4th 1227, the Board did not dispute that all the suitability factors, with the exception of the commitment offense, were favorable to the inmate, including his otherwise stable social history. In addition, it was undisputed that, "since day one," the inmate had engaged in extensive efforts to learn anger and impulse control through his participation in numerous self-help programs and his embracing Buddhism, and that those efforts had been successful. (*Id.* at pp. 1240–1241.) In another of petitioner's cases, *In re Lawrence, supra,* 44 Cal.4th 1181, "the Governor alluded to other possible grounds for denying petitioner's parole, [yet] *expressly relied only upon the nature of petitioner's commitment offense* to justify petitioner's continued confinement." (*Id.* at p. 1222, italics added.) Here, contrary to these cases, the Board relied upon several factors indicative of petitioner's unsuitability for parole, including his lack of insight into the causative factors of his offense and his long history of unstable and abusive relationships with women, not just his commitment offense. Moreover, while it is indeed true petitioner has engaged in *some efforts* to curb his antisocial behavior, contrary to *In re Singler, supra,* 169 Cal.App.4th 1227, the extent to which petitioner has succeeded at those efforts remains an open question.

Thus, because in this case the Board has provided reasonable grounds for denying parole that extend beyond the circumstances of the commitment offense, petitioner's authority provides no basis for overturning its decision. (See *In re Lawrence, supra*, 44 Cal.4th at p. 1214 ["Because the parole decision represents a prospective view—essentially a prediction concerning the future—and reflects an uncertain conclusion, rarely (if ever) will the existence of a single isolated fact in the record, evaluated in a vacuum, suffice to support or refute that decision."].)

Finally, we add that the circumstances of this case likewise distinguish it from a recent decision by our colleagues in the Court of Appeal, First District, Division Two, *In re Calderon* (2010) 184 Cal.App.4th 670 [109 Cal.Rptr.3d 229] (*In re Calderon*). There, the appellate court ordered the Governor to vacate his decision reversing the grant of parole, and reinstated the Board's grant of parole, after concluding there was no evidence supporting the factor relied upon most heavily by the Governor in finding the inmate currently dangerous—his purported lack of insight into the effects of his substance abuse. (*Id.* at pp. 688–689.) Rather, the appellate court found that all the evidence was to the contrary. In particular, the appellate court noted there was no evidence that the inmate denied having had a drug or alcohol problem, that he denied having had a problem for some period of his incarceration, or that his former desire for drugs or alcohol might still be a motivating force. (*Id.* at pp. 692–693.) Further, the court noted that "[o]ver a very long period of time, [the inmate] has actively and productively participated in virtually every substance abuse and other self-help program made available to him . . . ." (*Id.* at p. 693.)

In this case, to the contrary, there is indeed evidence, already discussed at length, that petitioner unjustifiably refused to take full responsibility for his past problems with attempting to control women through abusive means, which behavior is closely associated with both his commitment offense and unstable social history. Further, the evidence does *not* reflect that petitioner has fully committed himself to intensive rehabilitative efforts designed to address this behavior. As such, *In re Calderon* does not support reversal of the Board's decision in this case.[3]

---

[3] The dissent refers to language in *In re Roderick, supra*, 154 Cal.App.4th at page 265, that "it would be inappropriate for courts to salvage the Board's inadequate findings by inferring factors that might have been relied upon," and that, "[a]t minimum, the Board is responsible for articulating the grounds for its findings and for citing to evidence supporting those grounds" (italics omitted). (See also *In re Lewis* (2009) 172 Cal.App.4th 13, 29 [91 Cal.Rptr.3d 72]; *In re Moses* (2010) 182 Cal.App.4th 1279, 1310–1311, fn. 13 [106 Cal.Rptr.3d 608]; *In re DeLuna* (2005) 126 Cal.App.4th 585, 593–594 [24 Cal.Rptr.3d 643].) Here, however, the Board did articulate its reasons for denying parole, which included, among other reasons, petitioner's lack of insight into the offense's causative factors and his unstable social history. The Board also cited to evidence, which we have already discussed at length, supporting those

### C. *Marginal Parole Plans.*

█ Finally, we briefly mention the Board's finding that petitioner's parole plans were "marginal," and thus further evidence of his unsuitability for parole. Under the California parole scheme, an inmate's plans for release are relevant in deciding whether he or she is suitable for release. (Cal. Code Regs., tit. 15, § 2402, subds. (b), (c).) According to petitioner, however, his parole plans were adequate, and provided no evidence of his current degree of dangerousness.

According to the Board, its finding with respect to petitioner's parole plans was based upon evidence that he had only known the family offering him room and board upon his release for three and a half years, and that he remained unsure of how much money he had saved or would receive from Social Security. Petitioner does not dispute this evidence. As such, the Board's finding was not arbitrary or capricious, but rather was properly grounded in the record. Whether this court would have assigned more or less significance to this evidence is beside the point. Under the applicable standard of review, we need only conduct "such review as is necessary to determine whether there is *any* evidence in the record supporting the denial." (*In re Van Houten* (2004) 116 Cal.App.4th 339, 347–348 [10 Cal.Rptr.3d 406]; see *In re Shaputis, supra,* 44 Cal.4th at p. 1261; *In re Rosenkrantz, supra,* 29 Cal.4th at p. 677 ["It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole."].) Here, we have already made such a determination with respect to the evidence in the record relating to petitioner's lack of insight and unstable social history. And, for all the reasons set forth above, we indeed believe this evidence is sufficient to support the Board's determination that petitioner's release would unreasonably endanger public safety. Accordingly, petitioner's request for habeas corpus relief must be denied.

## DISPOSITION

The petition for writ of habeas corpus is denied.

**SIGGINS, J.,** Concurring.—I join fully in the opinion written by my colleague Justice Jenkins, but write separately to comment upon additional facts that support the reason cited by the Board of Parole Hearings (the Board) for finding Robert Shippman unsuitable for parole. As Justice Jenkins states, our task is to review the record of a petitioner's parole suitability

---

reasons. To the extent the dissent suggests this court lacks authority to consider evidence in the record supporting the Board's reasons for denying parole, but not expressly mentioned in the Board's written decision, we respectfully disagree.

hearing to ascertain if a decision to deny parole is supported by some evidence that the petitioner will pose an unreasonable threat to public safety if he or she is released. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1221 [82 Cal.Rptr.3d 169, 190 P.3d 535]; *In re Shaputis* (2008) 44 Cal.4th 1241, 1255 [82 Cal.Rptr.3d 213, 190 P.3d 573].) We are to view the reasons relied upon by the Board to deny parole and determine if a nexus exists between those reasons and danger to the public. (*In re Lawrence, supra,* at pp. 1210–1211.) In this case, I fully agree with Justice Jenkins that the Board was correct to conclude that Shippman's lack of insight into the circumstances of his commitment offense and his troubled relationships with women demonstrate that he is not ready for release. But that is not all that troubles me about this petitioner's record.

Facts in the record, but not mentioned or relied upon during petitioner's hearing, provoke my concern that Shippman is not being candid about, and has not reconciled himself with, the events leading up to his wife's murder. Shippman says that he unexpectedly killed his wife when he lost control of his emotions one morning while the two of them went for a ride to discuss their relationship. However, what is hard to reconcile with his version of these events are the facts that his murdered wife's car was discovered in front of Shippman's house with her purse inside it and the engine running. These facts logically create an inference that Shippman forced his wife to go for a drive, rather than suggest that she went voluntarily.[1]

The silent record on these facts is troubling, and the unaddressed inference of abduction is too pregnant for me to ignore. We are not precluded from considering these facts because they were not discussed at the parole hearing. Neither *Lawrence* nor *Shaputis* require that we ignore unexplained circumstances of Shippman's offense when those circumstances support a ground for unsuitability found by the Board. The questions these facts raise are too significant, and yield a certain commonsense apprehension over Shippman's readiness for parole.

The dissent criticizes my consideration of these circumstances of the crime because they were not recited in the Board's decision. But such a restriction on our review of the record seems, to me, an odd contortion of our deferential standard of review. To the extent reported cases of the Court of Appeal may

---

[1] It is also not entirely clear that the Board ignored these facts even though they are not mentioned. In its decision announced at the end of Shippman's hearing, the Commissioner said: "The committing offense is particularly disturbing, as previously discussed, because of the way it was done. The fact that you convinced the victim to come over to pick up her mail and then, through the course of conversation, you got her to your pickup, where a weapon was there, and took her for a ride to discuss things, and when she indicated that she had to call the individual that she was in fact having the affair with, you took her life by firing three rounds—not one but three rounds."

be read to impose such a restriction, I disagree. (Dis. opn., *post*, at pp. 488–489, citing *In re Moses* (2010) 182 Cal.App.4th 1279 [106 Cal.Rptr.3d 608]; *In re Lewis* (2009) 172 Cal.App.4th 13 [91 Cal.Rptr.3d 72]; *In re Roderick* (2007) 154 Cal.App.4th 242 [65 Cal.Rptr.3d 16]; *In re DeLuna* (2005) 126 Cal.App.4th 585 [24 Cal.Rptr.3d 643].) Under our standard of review, it seems to me entirely appropriate to draw inferences from the facts in the record that support the Board's reasons for finding a prisoner unsuitable for parole whether or not they are explicitly discussed in the narrative of the Board's decision.

Nor is a due process concern that may arise from our consideration of facts in the record supporting the Board's decision as "obvious" as the dissent says. As recognized by our Supreme Court in *Lawrence* and by the United States Supreme Court in decisions reviewing state parole processes, determining whether a prisoner is suitable for parole depends not simply on objective factfinding, but also on purely subjective evaluations and on predictions of future behavior by those entrusted with the decision. (See *Connecticut Board of Pardons v. Dumschat* (1981) 452 U.S. 458, 464 [69 L.Ed.2d 158, 101 S.Ct. 2460]; *Greenholtz v. Nebraska Penal Inmates* (1979) 442 U.S. 1, 8 [60 L.Ed.2d 668, 99 S.Ct. 2100]; *In re Lawrence, supra,* 44 Cal.4th at p. 1214.) Our state recognizes that prisoners have an expectancy they will be released to parole unless the Board finds them unsuitable.[2] (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 654 [128 Cal.Rptr.2d 104, 59 P.3d 174].) But the conclusion that due process requires that every fact supporting a decision by the Board to deny parole be recited in the Board's decision is not so obvious to me, and turns on an analysis that balances the governmental and private interests affected by the Board's decision. (See *People v. Ramirez* (1979) 25 Cal.3d 260 [158 Cal.Rptr. 316, 599 P.2d 622].) Overly restrictive views of the record that do not consider facts that support a decision finding a prisoner unsuitable for parole accord appropriate deference neither to the executives charged with making those predictive decisions, nor to their concern for public safety.[3]

For me, this case more closely resembles *Shaputis* than it does *Lawrence*. When we review the denial of suitability for parole, *Lawrence* instructs us

---

[2] Absent this state-created expectancy, parole decisions do not implicate due process concerns. "Decisions of the Executive Branch, however serious their impact, do not automatically invoke due process protection; there simply is no constitutional guarantee that all executive decisionmaking must comply with standards that assure error-free determinations. [Citations.] This is especially true with respect to the sensitive choices presented by the administrative decision to grant parole release." (*Greenholtz v. Nebraska Penal Inmates, supra,* 442 U.S. at p. 7.)

[3] Such a restrictive review of the record also seems to place the burden of proof in these cases on the Board rather than on the petitioner challenging the Board's decision. While our standard of review is prescribed by *Lawrence* and *Shaputis*, the allocation of the burden to demonstrate error remains unclear.

that "the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude." (*In re Lawrence, supra,* 44 Cal.4th at p. 1221.) It is precisely because of Shippman's dissembling responses to the Board's questions concerning his propensity to control his romantic partners and his history of violence that I conclude the unexplained circumstances of his commitment offense also support the Board's decision. (See *In re Shaputis, supra,* 44 Cal.4th at p. 1260.) I make no conclusion that Shippman abducted his wife, but these unexplained facts support the Board's decision to defer Shippman's further parole consideration for three years.

**POLLAK, Acting P. J.,** Dissenting.—I respectfully disagree with the opinions of my colleagues. The lead opinion upholds the decision of the Board of Parole Hearings (the Board) to deny petitioner Robert Shippman parole based not on the conclusion that there is some evidence to support the Board's findings, but on findings of its own that are not reasonably drawn from the record before us. In what follows I shall first set forth more fully certain background matters that appear in the present record, minimizing the repetition of facts that are adequately described in the lead opinion, then address the reasons for which the Board's analysis fails to withstand scrutiny, and finally address the purported evidence upon which the lead opinion relies to find "some evidence" that Shippman would pose an unreasonable risk to society if granted parole.

## I.

Shippman was born in 1938, the youngest of 11 children, and was raised in an intact family. His father was a chicken rancher who became pastor of a local church. Shippman's early life was stable. He graduated from high school and attended one year of college.[1] When he married his first wife in 1957, he dropped out of school to find work. The couple divorced in 1964, when his wife became pregnant by and ran off with Shippman's best friend. When his wife's paramour came to his house after he learned of the affair, Shippman beat him with a baseball bat. Shippman remarried in 1966. This marriage lasted 22 years, but ended when Shippman had an affair with Juli, whom he ultimately married.

---

[1] Despite having graduated from high school and taken college classes, Shippman reads at the 10th grade level. On a standardized test, the Test of Adult Basic Education, he scores at the 8.7 grade level.

Shippman married Juli in 1991, when he was 53 and she was 26. He murdered her in April 1993. During the marriage, Juli had an affair with one man and later with a second, whom she was seeing at the time of the murder. About one month before the murder, Juli had agreed to drive with Shippman to Calistoga to discuss their relationship; over Juli's protests, Shippman drove her all the way to Ukiah, presumably prompting Juli to obtain a restraining order against Shippman.

On the day of the murder, following a separation of several weeks, Shippman called Juli and asked her to pick up her mail. When she arrived at his house, Shippman convinced her to go for a ride with him. Shippman, who claims to have "loved Juli with every fiber of [his] heart," wanted to persuade her to terminate the affair she was having. They drove to a remote area. After they had been speaking for 10 to 15 minutes, Juli stated that she had to call the man she was dating. Shippman retrieved his rifle from his vehicle and shot her three times, once in the back of the head. Shippman initially claimed that he had first shot himself, attempting to gain Juli's sympathy, and then shot her as she approached him. At his parole hearing he acknowledged that he shot Juli first, then shot himself three times—twice in the chest and once in the head.

Other than the commitment offense, Shippman denies being violent towards any of his wives. He does, however, admit to a serious disagreement with his second wife, occasioned by his stepson's involvement with drugs. The wife wanted to "give him over" to state custody and Shippman refused, believing that they would be better able to help the child. They apparently retained custody of the boy who, at the time of the parole hearing, had in Shippman's estimation "turned out very well" and was working as a pilot.

Before his incarceration Shippman had worked as a plumber for nearly 30 years. For several years he owned his own plumbing business. He also owned a gas station for 13 years. He had no prior criminal or juvenile record.

In prison Shippman has worked as a plumber and his job performance has consistently been rated as satisfactory or above average. He has also earned vocational certificates in basic home repair, maintenance and building maintenance and safety, and carpentry. He instructs other inmates in plumbing and other trade skills.

In 2003 Shippman completed a 44-week anger management course, a 14-week awareness and empathy for survivors of crime course, and the "Impact" program. Shippman felt the anger management course was "a great course," but his efforts to repeat the course were stymied because his housing assignment changed three times after his previous parole hearing.

Since being incarcerated Shippman has been discipline free. The Board recognized this achievement: Deputy Commissioner Turner commented, "I applaud you for that; that's difficult to do, to stay disciplinary-free in the institutional setting, so you're doing some things right." Shippman regularly coaches softball and teaches Bible classes,[2] as well as instructs in the trades.

When paroled, Shippman intends to live with a couple from Yuba City, whom he met through his church activities some three and a half years before the parole hearing, who visit him regularly and have offered to provide him with housing. He claims to have savings, which his daughter monitors for him. Because of his age, 70 at the time of the hearing, and his steady preincarceration work history, he apparently will qualify for Social Security benefits, although he has not documented his entitlement to these benefits.[3] Shippman has also received letters of support from his sister, brother and daughter.

Shippman's most recent psychological evaluation, conducted in 2008, references his July 2004 psychological evaluation. The 2004 psychological report discusses petitioner's commitment offense, in part, as follows: "The pressure of the realization that his young and beautiful wife was unfaithful to him, and that he was about to lose her, was more than he could handle. He began using prescribed Valium, which he had used for two weeks, as well as on the day of the commitment offense. He stated that his thinking wasn't really clear due to the medications. He went on and explained that Juli was his 'princess.' He didn't want to lose her. He knew that he was losing her. At that point, he stated that, 'I should have stepped back and looked at my actions. What I did was devastating to Juli's family, and also has been devastating to my own family.' Inmate Shippman describes his actions as 'stupid, irrational, impulsive,['] without any thinking of what he was doing. [¶] In summation, it does appear that this act was the result of a man whose thinking was beclouded by Valium. He was overcome with emotional anguish and the feeling of losing his wife, and who was experiencing an enormous personal attack on his self-worth. As a result, he impulsively shot his wife, and then immediately turned the murder weapon on himself, shooting himself three times, twice in the chest, and once a glancing blow in the head. It was evident that he was trying to end his life at the same time. He probably would have if it had not been for the accidental discovery of the crime immediately after it happened by someone who just happened to pass by the remote location. [¶] Inmate Shippman's degree of remorse and sorrow is deep and

[2] Although Shippman was already a practicing Seventh-day Adventist before his crime, he now describes himself as "born again," signifying a deeper religious commitment, allowing him, he claims, to be less controlling.

[3] Shippman also has a backup possibility of working for his friend and former attorney as a plumber, but he does not intend to do so.

sincere. He fully realizes the seriousness of his actions, and the penalty that he must pay. As a result, he has no bitterness at all towards his prison incarceration and sentence. He repeated that he deserves every bit of the punishment that he is receiving and might receive in the future."

In assessing Shippman's potential for future dangerousness, the 2004 evaluator opined that he "poses a very low risk for any aggression or violent behavior." The evaluator characterized him as "passive, conforming, patient [and] thoughtful." If released, the psychologist concluded Shippman would pose an "extremely low" potential for violence. "In fact, based upon his years of incarceration, the maturity he has gained over those years, his deep sense of sorrow and remorse about the commitment offense, his ever-deepening awareness of spiritual truths, and the fact that he has learned that he must not take things into his own hands when disaster strikes, he actually *poses less of a threat to society than the average citizen.*" (Italics added.) The psychologist then stated: "In this case, there are no risk factors for this inmate that would cause this man to act out in a violent manner. His behavior in the commitment offense was related to his serious marital problems, deep emotional anguish, and beclouded thinking due to the Valium he was taking to help control these turbulent emotions. At this point in his life, he has matured a great deal. He has learned to handle stressful situations far differently than he dared at the time of the offense, and he has a totally different perspective towards life." Finally, the evaluator suggested that Shippman had "a deep understanding of the principles of anger management" and concluded that he had no further need to engage in further anger management training, psychotherapy or psychological evaluation.

The psychological evaluation conducted for the 2008 hearing is equally positive. The evaluation indicates that Shippman has been "programming in an excellent fashion." The report states that Shippman has no psychiatric diagnosis. The only current medical diagnosis that is noted is "GERD" (gastroesophageal reflux disease).[4] He is assessed on a scale of global functioning (i.e., how well one adapts to life's problems), measured from zero to 100, as 95—or functioning in the superior range. After reviewing his results on various standardized assessment guides indicating potential for future violence and recidivism—all of which indicate that his risk ranges from low to very low—the psychologist concluded that Shippman poses a "very low" overall risk for future violence. The psychologist indicated that if Shippman "act[ed] in passion or violence in the future, it would increase his

---

[4] The 2004 psychological evaluation notes that at age 28 Shippman suffered from testicular cancer, resulting in the removal of one testicle. The return to the present petition was filed by the acting warden of the California Medical Facility, where Shippman has been housed since August 2007. The record does not indicate the reason for which he is being housed in the medical facility.

violence risk," but concluded that there is "no reason to believe that he will commit this impulsive act . . . ." The report concludes, "At this time there is significant evidence that the inmate has the skills and insight necessary for decreasing his violence risk."[5]

## II.

Before coming to this court, Shippman filed a petition for habeas corpus in the Napa County Superior Court, which denied his petition. In holding that the Board's decision was supported by some evidence, the superior court pointed out that the Board had cited the gravity of the commitment offense, marginal parole plans, and unstable social history, and correctly recognized that that the Board relied "most heavily" on Shippman's "lack of insight into the causative factors of the crime."[6] In my view the record contains no

[5] The report indicates that the most reliable and valid method for assessing risk of future violence is an empirically based approach. Shippman's risk of future violence was assessed on three different empirical scales. On one, he was placed in the first percentile, which "does not meet the cutoff score indicative of psychopathy." On a second scale which measures the risk of general recidivism, Shippman's score indicates that he "is in the '**very low**' category, having scored lower than **99%** of North American sample of incarcerated male offenders." (Original boldface.) On the third scale, based on 20 risk factors, he scored in the low range for risk of future violence. "Taken together," the psychologist concluded, "the weight of the evidence indicates that the inmate poses a '**very low risk**' of violence in the community." (Original boldface.)

[6] The explanation for the Board's decision provided by the presiding commissioner is rambling and repetitive. I quote it at length, although far from in full, as follows: "Now the commitment offense itself, this offense was definitely carried out in a dispassionate and, we believe, in a calculated manner in that the victim came over to your place to get her mail, and for some reason you were able to convince her to go in your vehicle with you so you-all could talk. And one of the questions I asked earlier was why couldn't you have talked there? The fact that there was a gun in the vehicle at the time—and again, I'm not litigating the crime, but the fact that also there was a broken door in there (indiscernible) before, there was a restraining order [that] shows that you just wanted to get her there for the sole purpose of talking, and then maybe it got out of hand or whatever, but it was definitely done in a dispassionate and somewhat calculated manner. It clearly was done in a manner which demonstrated exceptional callous disregard for human suffering. You shot the victim three times. Unless you were using an automatic rifle that would fire three successive rounds, you had the opportunity to cease at any time, but yet you pulled the trigger three times just to kill the victim. And then, on top of that you turned and you shot yourself in a manner which—and I don't know exactly where you were shot or the basis of that, but the bottom line is she is now deceased and you're still with us. . . . We feel the motive for the crime was very trivial and senseless, because it appeared you were just jealous of the fact that your wife, who was substantially younger than you were, had found someone else. . . . You're 70 years old at this point but you still appear to have the physique of someone that's not a 70-year-old man. That's also a concern, the fact that you could go back out there and do the same thing, without knowing the reasons as to why you committed this crime. That's something that didn't come across with us today. The facts of the crime are as follows: . . . We note for the record that you had no prior criminality. You did have somewhat of an unstable social history primarily because there were problematic relationships with your romantic relationships. For some reason you were having difficulties

evidence to support any of these findings, much less that Shippman will pose an unreasonable risk to public safety if granted parole.

A parole denial by the Board must be upheld if there is "some evidence" supporting the conclusion that the petitioner's release would pose an unreasonable risk to public safety. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1208–1210 [82 Cal.Rptr.3d 169, 190 P.3d 535]; *In re Shaputis* (2008) 44

with people that you had been romantically involved with, with your first two wives and then your third wife, Juli. You indicated you were controlling on the first two and you also wanted to control Juli. And the fact of the matter is that today you were not able to tell us why you felt the need to be controlling, and the only thing you could tell us today was that you've taken an anger management course that was 40 weeks long or something, where you have identified that there is no need for you to be controlling. And I thought that the District Attorney in questioning you made a very valid point about the fact as to why you would need to be controlling, and you really didn't have an answer for that, just that, 'Well, it could have been that my father was controlling, although we came from a very strong household.' That should be something that . . . the panel would need to feel comfortable in that you know why you would even allow yourself to get into this type of mode that you were in to be able to, even at 70 years old, to go out there and become controlling again by not knowing the triggers that will allow you to go ahead and do that. Now, in any class that you take it basically tells you, gives you some tools to use, but we're not sure that you have the tools because of the one course that you took in anger management if it had gone on for a long period of time. That was in 2003. Now, if you had been continuously involved in those types of programs, we understand that you would (indiscernible), but that first course is just a building block (indiscernible), and you really need to stay involved with different programs so that you can see and develop those coping skills so that if you are finding yourself in that situation again. And who's to say that you won't find someone else that you will not revert back to the controlling features that you had at that time that contributed to the two failed—actually, three failed relationships? Because at the time Juli was also going to leave you as well, to the point that she had a restraining order. So it's very important that you get a hold on why it's necessary for you to have those controlling—the need to be controlling. And secondly, even though you have had one course in anger management, do you really know and understand and be able to identify those triggers that will put you back in that same type of environment again? And although you do take responsibility for your actions, this panel feels that you still lack the insight into the causative factors that contributed to you committing this offense. . . . On your parole plans, I think they're marginal. We feel they're marginal. You're going to live with the Morris family and you've known them for 3-1/2 years, yet you've been down . . . about 15 years, and yet you're going to go with a family—a Christian family, I might add—that is willing to give you a place. According to this letter, you met with them several times, and yet, you know, they're going to open their home to you, but you don't really have any support to—they'll give you room and board, but there are other things that we feel that you'll need, such as how do you get around? You want to go and do all the other stuff that you had; who's going to take care of your personal needs? You say you have money; your daughter should tell you about how much money you have. You also should go through Social Security to find out how much you would be receiving. I'm sure it's pretty substantial just going back looking when you were making 18, 19 bucks an hour at that time, which was pretty good money . . . so you probably will get a substantial amount of money from that along with what you already have, but you've got to come in here and show us—a panel—that one, you're going to be able to support yourself, because it's a lot more expensive to be living out there, and even though somebody's going to give you room and board, I'm sure they're not going to do it forever, and even though they're a Christian family."

Cal.4th 1241, 1254 [82 Cal.Rptr.3d 213, 190 P.3d 573].) The court's review is "unquestionably deferential, but certainly is not toothless, and 'due consideration' of the specified factors [establishing parole unsuitability] requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." (*In re Lawrence, supra,* at p. 1210.) With this standard in mind, there is in my opinion no evidence to support any of the factors relied on by the Board to deny parole.

### Commitment Offense

The Board found that the crime was committed in a "dispassionate" and "calculated manner," evidencing "exceptional callous disregard for human suffering." The Board noted that the victim came to Shippman's home to pick up mail, he convinced her to go for a ride with him, there was a gun in the vehicle, the vehicle's passenger door handle was broken, and the victim had obtained a restraining order against him. Furthermore, in shooting his wife, Shippman fired three successive rounds at her. He then shot himself, possibly in an attempt to obfuscate what had happened. The Board termed the motive for the offense "very trivial and senseless."

The record does not support the Board's characterization of the crime. Rather than dispassionate, the killing appears to have been a crime of passion—moreover, passion in the haze of taking prescribed Valium. There is no dispute that Shippman was upset by his wife's infidelity and desire to leave him. Sadly, analogous "love triangles" often lead to impulsive criminal behavior with tragic results, but consequences that are not regarded as trivially motivated. (See *In re Lawrence, supra,* 44 Cal.4th at pp. 1225–1226 [recognizing "significant emotional stress as a result of [petitioner's] love affair with the victim's husband"]; *In re Burdan* (2008) 169 Cal.App.4th 18, 25, 33–34 [86 Cal.Rptr.3d 549] [rejecting characterization of defendant murdering wife after he discovered she was having an affair as " 'dispassionate and calculated' "]; *In re Singler* (2008) 169 Cal.App.4th 1227, 1235–1236 [87 Cal.Rptr.3d 319] [wife's admission that she was having an affair and was divorcing husband, leads to shooting her in a fit of rage]; *In re Weider* (2006) 145 Cal.App.4th 570, 576 [52 Cal.Rptr.3d 147] [petitioner focused on victim who was committing adultery with petitioner's wife]; *In re Scott* (2004) 119 Cal.App.4th 871, 882 [15 Cal.Rptr.3d 32] [where defendant murdered a drug dealer who was having an affair with defendant's wife, characterizing the motive as "trivial" ignores human nature and experience].)

The fact that Shippman shot his wife three times does not demonstrate callous disregard for human suffering. When asked why it was necessary to shoot her "again," Shippman testified, "I didn't shoot her again. I pulled the

trigger three times—boom, boom—and that was it." There is no evidence to the contrary. No evidence has been cited suggesting that there was any interruption in the firing of the fatal shots, nor is there any indication that Shippman intended to torture Juli, relished her suffering, or attempted to injure multiple victims or did anything that makes this murder particularly egregious. As many courts have observed, all second degree murders involve some level of callousness and indifference to the suffering of others. (E.g., *In re Lawrence, supra*, 44 Cal.4th at pp. 1218, 1225; *In re Burdan, supra*, 169 Cal.App.4th at p. 36.) There is nothing in this record to suggest that this second degree murder was so callous as to indicate that Shippman is likely to commit another such offense if granted parole.[7]

Even if Shippman's crime could properly be characterized as especially callous or egregious, which it cannot, that fact alone would not supply the necessary nexus to the conclusion that Shippman is likely to commit another such offense in the future. (*In re Lawrence, supra*, 44 Cal.4th at pp. 1225–1226.) Neither the details of the crime nor any other evidence suggests that Shippman's crime reflects a psychopathy or other propensity making future acts of violence likely. As indicated above, the expert opinion is unanimously to the contrary. The facts of the crime clearly provide no evidence that he would pose an unreasonable risk to the public if released. (See *In re Singler, supra*, 169 Cal.App.4th at p. 1244.)[8]

### Marginal Parole Plans

Shippman's primary parole plan is to live with a couple whom as of the time of the parole hearing he had known for approximately three and one-half

---

[7] The Board suggests that there may have been some level of premeditation in planning the crime. However, there is no basis in the record to infer that the crime was calculated. There is no evidence suggesting that Shippman convinced his wife to go for a drive as part of a plan to kill her, rather than to persuade her to stay in the marriage. There is no evidence to dispute Shippman's claim that the rifle was in his vehicle as it always was for the purpose of hunting. Contrary to the Board's implication, the fact that the vehicle had a broken door handle does not suggest that the crime was "somewhat calculated." Shippman denies that he deliberately broke the handle and there is no contrary evidence. Indeed, the record is not clear when the handle was broken and when it was repaired; it is not clear that it was still broken on the day of the murder. In any case, Juli was not in the vehicle when Shippman murdered her. Shippman certainly did not execute a plan to trap Juli in the truck in order to kill her.

[8] The Attorney General also argues that because Shippman's 2008 parole denial occurred after he had served only 13 years of his sentence—less than his base term—the commitment offense is predictive of his risk if paroled. This argument is illogical and disregards the scheme articulated by the Supreme Court in *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783]. Suitability for parole and the appropriate base term for the offense are distinct issues, with the former to be determined prior to and independent of the latter. Were it otherwise, it would be necessary to determine the base term before determining suitability, which is the approach rejected in *Dannenberg*.

years through his church activities. He has acknowledged job skills, family support, some savings and undoubtedly is entitled to Social Security retirement benefits.[9] While it may be true, as the Board stated, that the couple may be unwilling to provide Shippman with room and board "forever," there is no evidence to suggest that his plans are so "marginal" as to indicate that he will pose an unreasonable risk to society if released. The applicable regulation concerning parole plans states that the Board should consider whether "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release." (Cal. Code Regs., tit. 15, § 2402, subd. (d)(8).) To be "realistic," parole plans need not be ironclad (*In re Andrade* (2006) 141 Cal.App.4th 807, 817 [46 Cal.Rptr.3d 317]) and they need not extend into the unforeseeable future. Indeed, the regulation simply requires "realistic plans for release" *or* "marketable skills" and there is no doubt that Shippman's plumbing skills are marketable. According to Shippman's 2004 psychological evaluation, his "prognosis for successful parole adjustment . . . is excellent. This inmate has outstanding vocational skills. He would have absolutely no difficulty finding, maintaining, and succeeding in employment in the community that will allow him to support himself. He has vocational skills in plumbing, household electricity, and carpentry skills. In addition, he has strong family support in the community. Research shows that strong family support in the community is a good indicator of successful adjustment."[10]

Thus, Shippman's parole plans meet the test enunciated in the Board's regulations. His intention to live with a couple who, knowing his situation, have invited him to live with them may not be an "ironclad" plan, but the Board has identified nothing about such a living arrangement that is objectionable and there is nothing in the record to show that the plan is unrealistic, especially since Shippman is expected to have an independent income stream.

Furthermore, the Board has the power to set reasonable parole conditions. (Pen. Code, §§ 3052–3053; *Terhune v. Superior Court* (1998) 65 Cal.App.4th 864, 874 [76 Cal.Rptr.2d 841].) Were the Board to consider it necessary, it

---

[9] Shippman also indicated that he has the opportunity to work for his former attorney. The Board disapproved any such idea because of Shippman's statement that the former attorney previously had urged him to testify falsely. We need not consider whether this fact, if true, would render a parole plan to work for the attorney unacceptable because Shippman indicated that he prefers to live with the couple, draw Social Security, and volunteer as an instructor in local jails.

[10] Indeed, the report goes on to state, "Inmate Shippman is currently engaged in training inmates on a voluntary basis in basic plumbing and electricity. He has developed lesson plans, technical drawings, and procedures to teach inmates basic skills that they can use when released. He is actively involved in a program he has developed, in which he teaches these skills to several dozen inmates. He spoke with enthusiasm about his plans when he is released to come to prisons on a voluntary basis to provide the same instruction to inmates in order to help them survive successfully in the community. His commitment to this helpful intervention appears to be very sincere and deeply held."

might condition Shippman's parole on his providing evidence that he has applied for his Social Security benefits, or upon his maintaining his residence with the couple who have offered to assist him or making other suitable living arrangements. Moreover, after a life-term prisoner is given a parole date, a parole agent investigates the individual's plans to confirm, among other things, the inmate's proposed residence. (Cal. Dept. of Corrections & Rehabilitation, Dept. Operations Manual, Adult Parole Operations, § 81010.5.1, pp. 668–669.) The agent determines whether a proposed program is suitable and, if the plan is not suitable, the parole agent must try to develop "an appropriate alternate program." (*Id.*, § 81010.5, p. 668.) Thus, although there is nothing in Shippman's parole plans that indicate he is likely to commit future offenses or would create an unreasonable risk to the public if released, if the Board deems it advisable it may prescribe reasonable conditions to maximize the likelihood of his achieving a successful parole.

### Unstable Social History

Shippman's social history is mostly stable. He was raised in an intact family and had no history of criminal conduct prior to the committing offense. The only element of instability is with respect to his multiple marriages and the infidelities associated with them. However, there is no indication that Shippman engaged in domestic violence with his former wives. His second marriage lasted for 22 years. The only disagreement that arose during this marriage described in the record concerned the proper handling of Shippman's stepson's drug problem and gave rise to no violence. Shippman did react with violence against his former friend with whom his first wife became pregnant, but this incident occurred in 1964 and there is no indication of similar outbursts until his crime in 1993, initiated by a somewhat similar provocation. His history may manifest a chronic problem with close emotional relationships with women, and a tendency to react with violence under sufficient provocation, but this history is among the immutable facts that are beyond Shippman's ability to change. The relevant and important question is whether this history is a valid predictor of Shippman's future behavior, and the Board has cited no reason to believe that it is.[11] To the

---

[11] *In re Criscione* (2009) 180 Cal.App.4th 1446 [103 Cal.Rptr.3d 549], decided and brought to our attention shortly before oral argument, is distinguishable on this basis. Criscione had a "significant history of volatile relationship instability with women" having previously attempted to poison the girlfriend that he later killed in a brutal manner, having "once tied her up and cut off her hair, then, several days later, beat her up," and having engaged in "much violence in the marriage" with a former wife. (*Id.* at pp. 1452, 1454–1455.) He denied much of this violence and refused to discuss the commitment offense either with the psychologists who evaluated him or with the Board. Criscione "had a history of mental problems, having been treated with electroshock therapy on several occasions." (*Id.* at p. 1451.) His most recent evaluator, although pointing out that "[r]isk assessment estimates suggest that the inmate poses a low likelihood to become involved in a violent offense if released to the free community"

contrary, all of the evidence tends to confirm Shippman's internalization of the anger management training he has received while in prison. That is the view of the psychologists who have examined him and subjected him to numerous empirically based assessment tests. He professes to be a "born-again" Christian and to have gained the understanding of, and to have overcome, his previous need to control the preferences of others. His conduct over some 15 years has been consistent with his professed change of beliefs. He not only has become a teacher of Bible studies (as well as of plumbing and other trades) but has remained entirely discipline free over the entire period of his incarceration. Particularly in view of his relatively advanced age, the Board provides no reason to believe that any instability in Shippman's social history is any longer a valid predictor of his future behavior or supports the decision to deny him parole.

### Inadequate Insight

During the course of his most recent parole hearing, Shippman told the Board, "I'm a complete different person than I was. I don't try to control situations now. Jealousy is a form of control, and that was a control that I tried to put over Juli. . . . I've learned how wrong that is. You can't control another person's love, and it's wrong." Later, when asked what made him feel that he could not accept rejection, Shippman responded, "I believe when I realized the use of Juli and that I could no more have her love, I didn't know how to take that. And when jealousy comes in—and jealousy is a form of wanting control—and when I could not control that situation, it got the best of me and I lost it." To a psychological evaluator Shippman described his actions in committing his offense as "stupid, irrational, impulsive, without any thinking of what he was doing." At the conclusion of the parole hearing, Shippman added, "I am very very sorry, and I wish there was some way to the Mathis family that I could say I'm sorry for this heinous crime and they would believe me, because believe me, I am."

The psychologists who evaluated Shippman in 2004 and in 2008 were convinced that he had gained the insight necessary to avoid repetition of his offense. According to the 2004 evaluation, "Inmate Shippman's degree of remorse and sorrow is deep and sincere. He fully realizes the seriousness of his actions, and the penalty he must pay. As a result, he has no bitterness at all towards his prison incarceration and sentence. He repeated that he

---

diagnosed Criscione "as suffering from 'Personality Disorder, NOS with passive-aggressive personality traits' " and expressed " 'concern . . . that these passive-aggressive personality traits may become more prominent when interacting with females in the community.' " (*Id.* at pp. 1452–1453.) His most recent psychological report "did not contain a conclusive assessment of Criscione's potential for dangerousness because Criscione had not been 'forthcoming' during that examination." (*Id.* at p. 1455.)

deserves every bit of the punishment that he is receiving and might receive in the future." The report continues, "Inmate Shippman has completed several self-help programs. He also has participated and completed Anger Management courses. It is obvious to this evaluator that he has a deep understanding of the principles of anger management, and why uncontrolled emotional reactions are totally unacceptable. There is no indication that this inmate needs further Anger Management training than he already has acquired. He does not need to participate in psychotherapy or engage in further evaluation." According to the psychologist who performed Shippman's evaluation in 2008, "At this time there is significant evidence that the inmate has the skills and insight necessary for decreasing his violence risk."

Nonetheless, the Board was concerned that Shippman was "not able to tell us why [he] felt the need to be controlling." Although never asked this specific question, Shippman did state that he felt his prior urge for control over others was traceable to his observation of the control his father had exercised during his childhood.[12] The Board considered this explanation inadequate and expressed concern that at the age of 70 Shippman would "go out there and become controlling again by not knowing the triggers" of this problematic behavior. The Board made no attempt to delve further into Shippman's understanding of the source of his control issue or to ask him what he considered to be the "triggers" of his impulsive behavior. The Board made no attempt to draw him out on these topics, or to ask any followup questions. Its response to Shippman's answer quoted in the footnote was simply "all right." The assistant district attorney who originally requested that the Board explore this issue went on to inquire into an entirely distinct subject.

An inmate's failure to appreciate the unacceptability of his or her criminal conduct, or to develop an understanding of what caused and how to avoid

---

[12] Because of the Board's expressed concern, I quote the relevant exchange in full:

"Deputy District Attorney Goold: Yes. I believe you asked this, Commissioner, at one point, but I don't believe he gave much of an answer as far as where he thinks these issues of control come from in his history, in his personality history, either his upbringing or where, what insight he has into those, because it's certainly not indicated in the psych report or anything that I've read.

"Presiding Commissioner Biggers: And I think you're right, I think he did mention the fact that he has control over it. When did you first realize you had controlling issues? I think would be the best way to ask that.

"Deputy District Attorney Goold: Okay.

"Inmate Shippman: Well, I believe many years ago—my dad was a very, very control[ling], and he asked the question about where did these issues come from, I believe, and I believe that is where, what I saw in growing up, although it was a loving family, although my dad was really a control person, and that is probably—that's no excuse, but in taking these courses—as I've said, and I will say it to the end—you can get over those by realizing that that is wrong, control issues over anybody. You can't control another person's love or affection.

"Presiding Commissioner Biggers: All right."

such conduct in the future—i.e., lack of "insight"—may provide a basis for finding an inmate unsuitable for parole. (*In re Shaputis, supra*, 44 Cal.4th at pp. 1260–1261.) However, like other factors that may tend to show an inmate's unsuitability, there must be some evidence in the record to establish the lack of insight. (*Id.* at p. 1260, fn. 18.) Authorities ranging from Socrates to Sigmund Freud have recognized the importance of acquiring personal insight.[13] Yet, as the Supreme Court has also recognized, "expressions of insight and remorse will vary from prisoner to prisoner and . . . there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior." (*Ibid.*)

The cases in which lack of insight has been held to support the denial of parole indicate the nature of the evidence that may establish such an unsuitability factor. *Shaputis* itself provides a clear illustration. Shaputis, like Shippman, murdered his wife. Shaputis, however, had a long history of domestic abuse—including inducing a miscarriage in his first wife when he jumped on her abdomen, holding a knife to his daughters' throats, threatening and repeatedly beating his second wife (the ultimate murder victim) severely enough to crack ribs and require plastic surgery, and firing a weapon at her. (*In re Shaputis, supra*, 44 Cal.4th at pp. 1246–1247.) He had a history of acting violently when drunk and, on the night of the murder, had an elevated blood-alcohol level. (*Id.* at p. 1247.) Nonetheless, Shaputis considered himself a " 'mellow . . . outgoing' drinker" and persisted in his belief that the murder of his wife was an accident. (*Id.* at pp. 1248–1249.) The Supreme Court concluded that "some evidence in the record supports the Governor's conclusion that [Shaputis] remains a threat to public safety in that he has failed to take responsibility for the murder of his wife, and despite years of rehabilitative programming and participation in substance abuse programs, has failed to gain insight into his previous violent behavior, including the brutal domestic violence inflicted upon his wife and children for many years preceding the commitment offense." (*Id.* at p. 1246.) The court pointed out that "the Governor's reliance on [Shaputis's] lack of insight is amply supported by the record—both in [Shaputis's] own statements at his parole hearing characterizing the commitment offense as an accident and minimizing his responsibility for the years of violence he inflicted on his family, and in recent psychological evaluations noting [Shaputis's] reduced ability to

---

[13] In addition to Socrates's famous admonition, "Know thyself," and Freud's development of psychoanalysis, designed to make one aware of unconscious motivation, the literature is replete with exhortations to develop insight and laments about the attendant difficulties of doing so: "The life which is unexamined is not worth living." (Plato); "Know then thyself, presume not God to scan; the proper study of mankind is man." (Alexander Pope); "It is as hard to see oneself as to look backwards without turning around." (Henry Thoreau); "There ain't no way to find out why a snorer can't hear himself snore." (Mark Twain); "Know thyself? If I knew myself I'd run away." (Johann Wolfgang von Goethe).

achieve self-awareness." (*Id.* at p. 1260, fn. 18.) Although noting that Shaputis "has stated that his conduct was 'wrong,' and he feels some remorse for the crime, he has failed to gain insight or understanding into either his violent conduct or his commission of the commitment offense. Evidence concerning the nature of the weapon, the location of ammunition found at the crime scene, and [Shaputis's] statement that he had a 'little fight' with his wife support the view that he killed his wife intentionally, but as the record also demonstrates, petitioner *still* claims the shooting was an *accident*. This claim, considered with evidence of [Shaputis's] history of domestic abuse and recent psychological reports reflecting that his character remains unchanged and that he is unable to gain insight into his antisocial behavior despite years of therapy and rehabilitative 'programming,' all provide some evidence in support of the Governor's conclusion that [Shaputis] remains dangerous and is unsuitable for parole." (*Id.* at p. 1260, fn. omitted.)

*In re Rozzo* (2009) 172 Cal.App.4th 40 [91 Cal.Rptr.3d 85] is another useful example in which the record provided meaningful objective evidence to support the inmate's lack of insight as a factor establishing his continuing dangerousness and unsuitability for parole. In that case there was evidence, including Rozzo's use of racial epithets and his stated goal of " 'nigger hunting' " (*id.* at p. 58), that his brutal, torturous, and prolonged murder of a Black victim was racially motivated (*id.* at pp. 44–45). Nonetheless, Rozzo denied that racial animus motivated the crime (*id.* at p. 47) and refused to acknowledge his direct participation in the killing (as opposed to the beating) (*id.* at p. 61). The court pointed out that "despite strong evidence that Rozzo's motivation for the murder was racial hatred, Rozzo has denied such a motivation," citing Rozzo's statements to evaluators and his refusal at the parole hearing to answer whether his crime had been racially motivated. (*Id.* at pp. 61–62.) "Further," the court pointed out, "there is no evidence that Rozzo has ever acknowledged that the murder was racially motivated or acknowledged that he ever harbored racial animus, in general. Nor is there any evidence that Rozzo has engaged in effective therapy or rehabilitative programming that might have eliminated such animus." (*Id.* at p. 62.) The court found in these facts "evidence that [Rozzo] lacks insight into the reasons why he participated in the murder [and that] [t]he circumstances of Rozzo's commitment offense thus continue to have probative value in predicting his current level of dangerousness." (*Id.* at p. 63; see also, e.g., *In re Smith* (2009) 171 Cal.App.4th 1631, 1638 [90 Cal.Rptr.3d 400]; *In re McClendon* (2003) 113 Cal.App.4th 315, 322 [6 Cal.Rptr.3d 278]; cf. *In re Criscione, supra*, 180 Cal.App.4th at pp. 1459–1460.)

The evidence of the inmate's lack of insight into the basis for his antisocial behavior in those cases stands in marked contrast to the record in the present case. Here, there is no evidence approaching the factors that reflected a significant lack of insight in those cases. The Board seems to have faulted

Shippman for giving what its members considered to be an inadequate psychological explanation of the roots of his controlling personality, and his failure to state what in the future might trigger an urge for violence, although he was never asked this question. There is no suggestion that Shippman did not fully appreciate the wrongfulness of his prior conduct and accept responsibility for his misdeed. Although the Board indicated that Shippman needs to participate in more anger management programs (which despite his efforts he had been unable to do because of housing transfers), the Board cited no evidence to support his need for such additional programming. The opinion of the psychologists who tested and evaluated Shippman is not necessarily determinative, but the Board provided no rationale for disregarding their unanimous view that he has successfully completed anger management training and needs no further such programming.

Numerous cases have rejected reliance by the Board or the Governor on an inmate's asserted lack of insight as a justification for denying parole where the record was equally devoid of evidence to support such a finding. (E.g., *In re Dannenberg* (2009) 173 Cal.App.4th 237, 255 [92 Cal.Rptr.3d 647]; *In re Palermo* (2009) 171 Cal.App.4th 1096, 1110–1112 [90 Cal.Rptr.3d 101]; *In re Rico* (2009) 171 Cal.App.4th 659, 678–679 [89 Cal.Rptr.3d 866]; *In re Singler, supra*, 169 Cal.App.4th at p. 1241; *In re Roderick* (2007) 154 Cal.App.4th 242, 271–272 [65 Cal.Rptr.3d 16].) "In the aftermath of *Lawrence* and *Shaputis*, the denial of parole now seems usually based, at least in part, upon the inmate's asserted 'lack of insight' in some respect, which has become the new talisman." (*In re Calderon* (2010) 184 Cal.App.4th 670, 689 [109 Cal.Rptr.3d 229].)

The case that may be most closely analogous to the present situation is *Singler*. Singler shot and killed his wife after a period of marital difficulty, including an affair by his wife, when Singler learned of her intent to leave him. (*In re Singler, supra*, 169 Cal.App.4th at p. 1232.) Although the Board acknowledged many favorable suitability factors in support of parole, it found Singler unsuitable due to a lack of insight. (*Id.* at p. 1241.) "[T]he Board argues the denial of parole is supported by evidence of Singler's lack of 'insight' into what triggered the murder of his wife—specifically 'why he "snapped" and decided to kill [her] rather than simply scare her.' According to the Board, Singler's inability to explain this supports its finding that he posed a risk of reacting in a similar way if confronted on parole with an ' "acute loss of significant relationships or feelings of sudden betrayal in [a] relationship in which he is emotionally invested." ' " (*Ibid.*) The court's review of the record, however, found that Singler adequately explained the reasons for his crime: "According to him, after months of marital difficulty due to [his wife's] compulsive spending, he learned from [her] that she was having an affair with another person, that she wanted to divorce him and take their children, that she had emptied their bank account, and that she threatened to leave him destitute. All of this, he said, caused him to be

overcome by rage. He 'just completely blew it' because of the heartbreak and loss of his dreams for the future." (*Ibid.*) He articulated that what he had done was unacceptable and that through therapy, self-help programs, and religious conviction, he had learned how to control his anger. His behavior in prison supported his claim that he had learned how to control his anger "even though life in prison had presented a myriad of opportunities to 'snap' from stress." (*Ibid.*) Like Shippman, he had positive psychological evaluations indicating that he had embraced his self-help courses and achieved emotional stability. (*Id.* at p. 1242.) The court concluded, "In sum, there is no evidence that Singler lacks insight into why he killed his wife. To the contrary, the evidence disclosed that for many years, Singler has understood the reasons why he killed his wife, has recognized that he significantly overreacted to his angry impulses in doing so, and has learned to harness in socially acceptable ways the anger arising from life's inevitable frustrations." (*Id.* at p. 1243.)

Another instructive case is *In re Dannenberg, supra,* 173 Cal.App.4th at page 255, in which the court explicitly rejected an attempt to rely on *Shaputis* under circumstances very similar to those that are present here. Dannenberg had killed his wife after having "experienced severe domestic difficulties for a number of years." (*Id.* at p. 242.) In support of his decision to deny parole, the opinion recites, "The Governor relies on *Shaputis* and argues that there is some evidence in the record that Dannenberg is unsuitable for parole due to his 'lack of insight' into the commitment offense. He cites to no *evidence* whatsoever in the record to support this contention. [Fn. omitted.] Indeed, all of the psychological reports reflect that Dannenberg has gained a great deal of insight into his offense over the years, and has acquired skills to enable him to avoid violence in the future. All of these reports have found that he has no need for further therapy. The Governor's reliance on *Shaputis* is inapt. In *Shaputis*, the Governor's finding that Shaputis lacked insight into his offense was supported by psychological reports and other evidence that Shaputis, an alcoholic with 'schizoid' tendencies, continued to deny responsibility for committing the offense. There was also a great deal of evidence that Shaputis had a long history of violence, which he also denied. Here, the Governor's unsupported belief that all of the psychological reports are wrong does not constitute 'some *evidence*' that Dannenberg currently poses an unreasonable risk of danger to society." (173 Cal.App.4th at pp. 255–256.) The court's footnote 5 adds, "The Governor purports to find support for his conclusion in 'the District Attorney's opinion' that Dannenberg lacks sufficient insight into his crime. The district attorney's 'opinion,' like the Governor's belief, is not *evidence*, and therefore does not constitute 'some evidence' supporting the Governor's decision." (*Id.* at p. 255, fn. 5.)

The court in *Rico* gave equally short shrift to the claim that because Rico " 'did not discuss the crime or his insight and remorse,' " it could be assumed that he lacked insight, rendering the commitment offense probative of current

dangerousness. (*In re Rico, supra,* 171 Cal.App.4th at p. 678.) The court noted that notwithstanding his attorney's statement that Rico would not discuss the crime, Rico did so—accepting both a prior statement of facts and his responsibility for his actions. He had also discussed the crime with his psychological evaluator, who found his feelings of remorse to be " 'sincere and genuine.' " (*Id.* at p. 679.) In that discussion, he renounced his previous belief in gang values and described his prison term as " 'a very good thing for him' " in that it interrupted his pattern of peer dependence that had contributed to his prior gang activity. (*Ibid.*) Based on this record, the court concluded that the Board could not properly find a lack of insight supporting the conclusion that Rico was currently dangerous. (*Ibid.*)

Similarly, in *Roderick* the Board was dissatisfied with Roderick's answers to questions asking "why he had led a life of crime." In rejecting this asserted lack of insight as a factor supporting the denial of parole, the court stated, "Certainly, Roderick's responses were unsophisticated and lacked analytical depth. But is his inability to articulate a more insightful explanation as to why he committed multiple crimes some evidence that Roderick poses a danger to public safety? The record does not support that conclusion. The evidence does show that Roderick has a limited capacity either to understand or to explain the mechanisms that led to his criminality. But this limitation is a known quantity and has been factored into his risk assessment. . . . [¶] Roderick provided a less than incisive explanation for his chronic criminality, but his responses also reflected acceptance of his alcoholism, acknowledgement of responsibility for his crimes, remorse, and shame. Ignoring the unanimous clinical evidence to the contrary presented by trained experts— since 1999 all psychological reports conclude he would pose no more danger to society than the average citizen—the Panel's arbitrary pronouncement that Roderick's limited insight poses an unreasonable risk to public safety cannot be considered some evidence to support a denial of parole." (*In re Roderick, supra,* 154 Cal.App.4th at pp. 271–272, fn. omitted; see also, e.g., *In re Calderon, supra,* 184 Cal.App.4th at pp. 688–693; *In re Lawrence, supra,* 44 Cal.4th at pp. 1222–1223; *In re Palermo, supra,* 171 Cal.App.4th at p. 1112.)

Here, as in these latter cases, the Board pointed to nothing that contradicts the psychologists' conclusion that while in prison Shippman has developed a radically different and positive perspective on life, that he is genuinely remorseful for the crime he committed and for which he accepts responsibility, that he has acquired an understanding of anger management principles, and that he has no further need for additional anger management programming. The Board's apparent view that Shippman's understanding of the

psychological mechanisms that triggered his need for control over his wives is superficial neither finds support in the record nor tends to show that he is likely to reoffend. Shippman's educational level is below that of a high school sophomore. It is unrealistic to expect him to articulate a psychological analysis in a highly sophisticated manner. His responses to the questions addressed to him by the Board reflect an understanding of the circumstances that prompted his crime; the Board can hardly fault him for failing to identify a specific trigger that might stimulate a violent reaction when it did not ask him to do so. Even if he did not respond to the Board's satisfaction, vagueness alone does not constitute evidence that Shippman's level of insight is such that he would be a danger to the public if released on parole. (*In re Roderick, supra,* 154 Cal.App.4th at p. 265.)

When the Board conducts a parole hearing, it has the advantage of personally observing the inmate. From the individual's demeanor or manner of answering questions, the Board may develop a concern as to whether the inmate is being forthright or providing rote responses that mask attitudes that reasonably can be anticipated to lead to violence upon release from prison. However, the Board also has the ability to ask further questions and to probe the basis for whatever misgivings it may have. When an inmate comes before it with psychological evaluations indicating that he or she has developed personal insight and presents a low risk of reoffending, the Board's speculative hunch does not provide some evidence to the contrary. Further questioning may develop some evidence to support a finding that the inmate has not internalized the means of avoiding future violence and remains a risk of reoffending, as illustrated by the records in *Shaputis* and *Rozzo,* discussed above. But when, as here, the Board does not pursue the inquiry and elicits no answers that reasonably support such a finding, pure speculation that the inmate does not appreciate the "triggers" of violent behavior does not provide the necessary evidence to justify the denial of parole.

A review of the entire record provides no evidence that Shippman would pose an unreasonable risk of danger to society if paroled. All of the applicable suitability factors specified in the Board's regulations militate in favor of suitability. (Cal. Code Regs., tit. 15, § 2402, subd. (d)(1)–(9).)[14] With the exception of his unstable relationships with his former wives, a historical

---

[14] The Board is to consider all available relevant and reliable information in determining parole suitability. (Cal. Code Regs., tit. 15, § 2402, subd. (b).) Factors which tend to show suitability are: (1) the lack of a juvenile record, (2) a stable social history, (3) showing signs of remorse, (4) motivation for significant stress being a motivation for the crime, (5) suffering from battered woman syndrome when the crime was committed, (6) the lack of a significant history of violent crime, (7) being a relatively advanced age, (8) having made realistic plans for release or developed marketable skills, and (9) having engaged in institutional activities indicating an enhanced ability to function within the law upon release. (*Id.,* § 2402, subd. (d).) All but the fifth of these factors apply to Shippman.

fact beyond his power to change, none of the unsuitability factors apply. (*Id.*, § 2402, subd. (c).)[15] In short, the record contains no evidence supporting the Board's finding that he is unsuitable for parole.

### III.

The lead opinion does not defend the Board's decision on the basis on which the Board relied. Rather, based upon its own review of the record, the lead opinion finds that Shippman has dissembled various facts, tending in the lead opinion's view to support a finding that Shippman lacks the insight into his behavior necessary to eliminate the risk of future dangerousness. I respectfully submit that there are at least two fundamental problems with the lead opinion's approach. First, this court's reliance on findings and credibility determinations that the Board did not make exceeds the appropriate scope of review. We are to determine whether there is evidence to support the Board's findings, not make our own. "Given the extraordinarily deferential standard of review we already apply to the Board's decisions, it would be inappropriate for courts to salvage the Board's inadequate findings by inferring factors that might have been relied upon. *At minimum,* the Board is responsible for articulating the grounds for its findings and for citing to evidence supporting those grounds." (*In re Roderick, supra,* 154 Cal.App.4th at p. 265; see also, e.g., *In re Lewis* (2009) 172 Cal.App.4th 13, 29 [91 Cal.Rptr.3d 72] ["in reviewing the Board's decision that an inmate is not suitable for parole, the question is whether or not the Board's conclusion that a particular inmate poses a current danger to society is supported by the Board's analysis of the various unsuitability and suitability factors . . .."]; *In re Moses* (2010) 182 Cal.App.4th 1279, 1310–1311, fn. 13 [106 Cal.Rptr.3d 608]; *In re DeLuna* (2005) 126 Cal.App.4th 585, 593–594 [24 Cal.Rptr.3d 643].)

Second, and most importantly, the record does not support the adverse implications concerning Shippman's credibility that the lead opinion draws from the record. The lead opinion in part misreads the record and in part relies on speculation concerning facts not contained in the record and concerning what Shippman's answers to questions not asked of him might have been.

To be specific, in asserting that the record provides support for the Board's "concern[] that, without a deeper understanding of what triggers his extreme and sometimes violent controlling behavior, petitioner would return to it upon his release, particularly if he became romantically involved with other

---

[15] Factors which tend to show unsuitability are (1) an especially heinous, atrocious or cruel commitment offense, (2) a history of having inflicted or attempted to inflict serious injury on a victim, (3) a history of unstable relationships, (4) a history of being sexually sadistic, (5) a lengthy history of severe mental problems, and (6) a history of engaging in serious misconduct while in custody. (Cal. Code Regs., tit. 15, § 2402, subd. (c).)

women" (lead opn., *ante*, at p. 458), the lead opinion first "acknowledge[s] much of his testimony appears quite reflective and forthcoming with respect to these problems" (*id.* at p. 459). But the lead opinion then finds contrary evidence in a supposed contradiction between Shippman's testimony that he thought control had not been an issue with his prior wives and a subsequent answer that control was a factor in his prior relationships. (*Ibid.*) The lead opinion also implies that Shippman acknowledged abusing his second wife. The record contains no such contradiction and no such acknowledgement. Early in the parole hearing, Shippman was asked, "Do you feel that controlling [his two prior wives] was also a factor in your prior relationships?," to which he answered, "No, sir." Much later in the hearing, the following exchange occurred:

"Deputy District Attorney Goold: There are indications, at least in the police reports, about prior reports of physical abuse or emotional abuse with his previous wives, and doesn't he think that is something that's continued throughout his social history?

"Inmate Shippman: No, sir. There was one with my [second] wife . . . who I was married to for 22 years. One incident where that happened is right.

"Presiding Commissioner Biggers: But I did ask you about that earlier and you told me that that was not an issue.

"Inmate Shippman: With what, control?

"Presiding Commissioner Biggers: Control.

"Inmate Shippman: Well, control wasn't an issue, I don't—

"Presiding Commissioner Biggers: What happened with this incident that the District Attorney's talking about?

"Inmate Shippman: Our son had gotten in trouble with drugs, and so my wife and I talked about it and she said, 'Well, we're going to have to give him over and put him to the state,' and I said, 'No, we're not. We're not going to do that, because if we give him over to the state then they're not going to help him like he can help here [*sic*].' And my son turned out very well, he's a pilot now.

"Presiding Commissioner Biggers: Was there any physical altercations?

"Inmate Shippman: No, I had no physical violence.

"Presiding Commissioner Biggers: Towards any of your wives?

"Inmate Shippman: Towards any of my wives, until I did this with Juli."

Thus, contrary to the implications of the lead opinion, Shippman was consistent in his testimony that there had been no violence or control issues with his prior wives, and the record contains no evidence to the contrary. There is absolutely no basis to imply that his disagreement with his second wife concerning the appropriate response to her son's drug problems involved any violence or inappropriate behavior on Shippman's part. Moreover, the incident in which Shippman attacked with a baseball bat the man with whom his first wife was having an affair, to which the lead opinion also refers as another "incident[] of abuse" (lead opn., *ante*, at p. 459), was forthrightly acknowledged by Shippman and, as he testified, involved no violence against his wife.

The lead opinion also asserts that Shippman's testimony concerning his relationship with Juli "casts further doubt on his denial of having emotionally or physically abused his former wives" (lead opn., *ante*, at p. 460), but the record provides no support for such a sweeping statement. The probation report to which the lead opinion refers does state that "[t]here were a number of police reports at the [police] department relating to the events surrounding their separation and of the problems they were having," but neither the report nor any other evidence specifies what those problems were nor indicates that Shippman had been violent towards Juli. Whatever one may speculate, Shippman was not asked about those problems and there is no evidence disputing his testimony concerning the absence of violence from their prior relationship. When asked why it was necessary for Juli to obtain a restraining order against him, Shippman understandably responded that he did not know how to answer that question but went on: "I'd never been violent towards Juli, but I guess she was either afraid to come to the house—although she had come to the house quite often to get mail, and there's other times when I had just given her mail at the front door." The presiding commissioner then asked, "But you had never been violent with her in the past" to which Shippman answered, "No, I had not."

The lead opinion opinion indicates that Shippman first denied but then acknowledged "forcibly taking Juli to Ukiah" in the weeks before the murder. (Lead opn., *ante*, at p. 460.) The testimony, however, reveals that Shippman always acknowledged that while Juli had agreed to drive with him to Calistoga, over her protest he drove much further, to Ukiah. The record reflects neither a contradiction in Shippman's testimony nor the use of

violence in his prior relationship with Juli; at most it reflects some confusion over the multiple senses in which the word "force" may be used.[16]

In short, the record contains absolutely no evidence to support what the lead opinion finds to be "the behavior apparent in [Shippman's] unstable relationships with his former wives" on which it justifies "inferences" that "(1) petitioner has a serious problem with wanting to maintain control over the women in his life; (2) this problem has repeatedly manifested itself in the form of emotional or physical abuse directed toward these women; (3) petitioner is not yet willing to take full responsibility for this pattern of abusive conduct; and (4) petitioner's failure to take full responsibility for his abusive conduct indicates a lack of insight into the root causes of his crime." (Lead opn., *ante*, at p. 460.) Shippman admittedly was twice divorced before marrying Juli, and in that sense had unstable relationships (although one of the prior marriages lasted 22 years), but there is absolutely no evidence in the record that he ever engaged in violence towards any of his former wives or that he engaged in violence against Juli prior to the commission of his life offense.

In defending the Board's rejection of the unanimous view of the evaluating psychologists that Shippman has acquired "a deep understanding of the principles of anger management" and "the skills and insight necessary for decreasing his violence risk," the lead opinion speculates that Shippman failed to discuss with the psychologists his prior marriages and the incident in which he previously drove Juli beyond Calistoga to Ukiah. The psychologists' reports do disclose some discussion with Shippman concerning his prior

---

[16] The relevant testimony reads as follows:

"Presiding Commissioner Biggers: Did you take her forcibly someplace before to talk (indiscernible)?

"Inmate Shippman: I did not take her forcibly. I know the incident you're talking about, when we went and we were going to go out for breakfast, and we were going to go to Calistoga. But you're right, instead of me stopping in Calistoga, I kept going.

"Presiding Commissioner Biggers: Why'd you do that?

"Inmate Shippman: Because I wanted to talk to her. We had talked—I have to say, back then I thought I could take control of the situation, which I found out I couldn't, and so I thought by talking and talking to her that I could perhaps talk her out of that, but I realized that I could not.

"Presiding Commissioner Biggers: But she didn't want to go with you to there, did she?

"Inmate Shippman: Yes, she did. She wanted to go. We were just going to go to Calistoga and have breakfast, and that's what I told her.

"Presiding Commissioner Biggers: But you went past Calistoga.

"Inmate Shippman: Yes, I did.

"Presiding Commissioner Biggers: But did she want to go past Calistoga with you?

"Inmate Shippman: Probably not.

"Presiding Commissioner Biggers: Okay. Well, then, that means you forcibly took her, because she didn't want to go that far with you.

"Inmate Shippman: Yes, sir."

marriages and Shippman testified that he did discuss "control issues" with at least one of the psychologists. The reports do not purport to relate everything that was said during the course of the evaluation interviews, and there is no basis for speculating that Shippman failed to mention a particular fact simply because it is not recited in the report, much less for assuming that a particular question was even asked of him. The lead opinion criticizes the psychologists for their asserted "failure to analyze the one aspect of petitioner's personality that is suspected to have contributed to his failed relationships *and* his commission of murder." (Lead opn., *ante*, at p. 462.) The reports themselves would seem to refute this criticism, but in all events any shortcoming in the work of the psychologists, who were retained by the Board to evaluate Shippman, hardly provides affirmative evidence that Shippman lacks the insight necessary to avoid further violent antisocial conduct.

Finally, the concurring opinion of Justice Siggins attempts to justify the Board's denial of parole based on "unexplained circumstances of his commitment offense" (conc. opn., *ante*, at p. 467) "not mentioned or relied upon during petitioner's hearing" (*id.* at p. 465). As previously noted, this approach is in itself improper. (*In re Roderick, supra*, 154 Cal.App.4th at p. 265; *In re Moses, supra*, 182 Cal.App.4th at p. 1310, fn. 13; *In re Lewis, supra*, 172 Cal.App.4th at p. 29; *In re DeLuna, supra*, 126 Cal.App.4th at pp. 593–594.) The concurrence assumes that Shippman "is not being candid about, and has not reconciled himself with, the events leading up to his wife's murder" based upon the apparent fact that his wife's car was discovered in front of his house with her purse inside and the engine running. (Conc. opn., *ante*, at p. 465.) The due process concern in relying on matters about which Shippman was never asked or given an opportunity to explain is obvious.[17] There are many possible explanations for the condition in which Juli left her car on the day of the murder. However likely or unlikely the concurrence's explanation may be, it is entirely speculative. It provides no competent basis for rejecting Shippman's acceptance of responsibility for his misdeed and concluding that he would pose an unreasonable risk to society if granted parole.

The situation in this respect is much like that presented in *In re Moses, supra*, 182 Cal.App.4th 1279, in which the Governor's denial of parole was

---

[17] The concurrence does not simply refer to what it considers additional evidence in the record to support a finding made by the Board, but develops a new theory on which the Board made no finding and placed no reliance. As shown by the extensive remarks of the presiding commissioner quoted in footnote 6 above and in footnote 1 of the concurrence, the Board did not find or intimate that Shippman had been less than candid in his description of the circumstances leading to the killing, or mention any perceived discrepancies in his description of the crime in explaining why it felt Shippman lacked insight or remained a potential risk to public safety if released on parole. The same is true with respect to the additional matters referred to in the lead opinion (discussed above) to justify the Board's ultimate decision to deny parole.

overturned where the Governor had relied on discrepancies in the inmate's version of his second degree murder to conclude that he did not in fact accept responsibility for his actions and continued to pose an unreasonable risk of danger to society. The court held that "[t]he Governor cannot simply ignore the undisputed evidence of Moses's taking of responsibility and repeated expressing of remorse" (*id.* at p. 1308)—which were much like those of Shippman here. With respect to the discrepancies in Moses's version of the killing, the court observed: "Moses's recollection of events, to the extent it differed from other evidence, is insignificant in light of his acknowledgment that he murdered Rhodes and repeated expressions of remorse, his extensive drinking on the day in question, which could have affected his perceptions, his denunciation of drinking and guns, his long-standing participation in prison in self-help programs such as [Alcoholics Anonymous] and [Victim Offender Reconciliation Group], his exemplary disciplinary and work record in prison, and the multiple positive psychological evaluations . . . . Therefore, we conclude these discrepancies are not some evidence of present dangerousness." (*Id.* at p. 1310.)

Thus, upon careful review, the additional matters plumbed from the record by the lead opinion provide no basis for rescuing the deficient analysis of the Board. I would grant the petition for a writ of habeas corpus and direct the Board to vacate its 2008 order deeming Shippman unsuitable for parole and to fix a date for his parole in accordance with all other provisions of law.

Petitioner's petition for review by the Supreme Court was denied September 22, 2010, S184079.